CHRISTENSEN, Justice.
Plaintiff seeks review of a district court order granting summary judgment to the defendants on all claims in an employment case. On appeal, plaintiff raises three issues. He argues the district court erred when it determined judicial review following the administrative process was the exclusive means to seek redress for alleged retaliation against a whistleblower. Next, he argues the district court erred by denying his age discrimination claim. Lastly, the plaintiff challenges the district court's finding of no "outrageous" conduct sufficient to support his tort of intentional infliction of emotional distress.
We must first decide whether plaintiff's direct civil action under Iowa Code section 70A.28(5) (2014), the whistleblower statute, is precluded by the availability of an administrative remedy. Relying on this court's decision in Walsh v. Wahlert , 913 N.W.2d 517 (2018), we conclude section 70A.28(5) expressly creates an independent cause of action in the alternative to administrative remedies under Iowa Code chapter 17A. Therefore, we reverse summary judgment as to that issue. For plaintiff's claim of age discrimination under the Iowa Civil Rights Act, we affirm the district court's determination that plaintiff failed to present sufficient evidence from which a reasonable jury could infer age discrimination was the real reason for his termination. We also affirm summary judgment on plaintiff's intentional infliction of emotional distress claim. None of the defendants' conduct was sufficiently egregious to satisfy the "outrageousness" prong.
I. Background Facts and Proceedings.
In 1988, Larry Hedlund began a career with the Iowa Department of Public Safety *713 (DPS) as a trooper in the Iowa State Patrol. In 1989, he became a special agent for the Iowa Department of Criminal Investigation (DCI), and in 2010, was promoted to special agent in charge (SAC).
In October 2012, Brian London became commissioner of DPS. London then appointed Assistant Director Charis Paulson as the director of DCI. In January 2013, SAC Gerard Meyers was promoted to assistant director for field operations of DCI and became Hedlund's direct supervisor. About a month later, Hedlund composed and circulated an email critical of Meyers. Members of DCI, including Hedlund's subordinate agents, received the email. The following day, Meyers set up a meeting with Hedlund to discuss, among other things, the email. During that meeting, Hedlund was not disciplined although Meyers advised him to stop circulating critical emails. Meyers also told Hedlund he did not want to have issues with him since he was in the "twilight of his career." However, Hedlund continued sending emails critical of upper management within DPS and DCI.
On April 17, 2013, Hedlund filed a complaint with the Professional Standards Bureau (PSB) against Paulson. The complaint alleged that on August 28, 2012, Paulson distributed an email to members of DPS in violation of department policy. Hedlund also alleged Paulson condoned the persistent misuse of physical fitness incentive days. Similarly, on May 29, 2013, Hedlund filed a complaint with PSB against Meyers. The complaint alleged Meyers condoned the misuse of physical fitness incentive days and encouraged personnel to ignore parking citations.
On April 18, 2013, Paulson, Meyers, and the SACs held a conference call to discuss strategic planning regarding the Field Operations Bureau of DCI. Paulson indicated "Hedlund became extremely angry, yelled at [him] and spoke in an unprofessional and insubordinate manner." The strategic planning was again discussed during an in-person meeting on April 23, 2013. The SACs expressed resistance to the proposed reduction of zones and agents. The issue of agent burn-out and suicide arose. Hedlund agreed with the stress-related issues and mentioned a past colleague committed suicide. Paulson reported Hedlund mentioned suicide four times. On April 25, Hedlund sent another email to his subordinates critical of DPS management.
Hedlund requested and received approval for vacation on April 26 to attend his niece's art show in Cedar Rapids. The evening before, he drove his state vehicle from Fort Dodge to Cedar Rapids where he spent the night. The next morning, Hedlund contacted Wade Kisner, a retired DCI agent, to discuss cold cases, and they met for a few hours. That same day, Paulson filed a complaint with PSB against Hedlund. Paulson claimed Hedlund had been disrespectful and insubordinate during the April 18 conference call. Unaware of Hedlund's approved vacation day, Paulson attempted to contact Hedlund on April 26. Paulson called and texted Hedlund numerous times. Paulson indicated this was an attempt to set up a meeting regarding Hedlund's conduct. When asked if he was working, Hedlund responded "yes and no."[1] Paulson rescheduled the meeting to Monday April 29[2] because of Hedlund's approved vacation day.
*714 Hedlund departed from Cedar Rapids on the afternoon of April 26. On his way to Fort Dodge, he spotted a black SUV doing a "hard ninety." Hedlund contacted the Iowa State Patrol. Trooper Matt Eimers intercepted the speeding SUV but determined it was an official state vehicle under the operation of another Iowa State Patrol trooper for the purpose of transporting the Governor of Iowa. The SUV was not stopped and no citation was issued.
On April 29, Hedlund sent Paulson a lengthy email regarding Meyers's inability to perform his job. A half-hour later, Hedlund sent another email to Paulson and Meyers designated "a complaint against myself." This email detailed the Governor's SUV incident. Hedlund summarized his failure to issue a citation to a speeding vehicle.
I take full responsibility for the incident being initiated and as such will accept the responsibility of ensuring that the appropriate actions are taken to address this incident. As the ranking sworn peace officer involved in this incident and as a Supervisor with the Department of Public Safety, I should have insisted that the vehicle be stopped.
That same evening, Hedlund sent a third email to Paulson, Meyers, and his subordinates. The email indicated Hedlund needed personal time for the remainder of the day as well as April 30. In response, Meyers noted Hedlund was not on approved leave status. On April 30, Hedlund sent Paulson and Meyers an email that explained his leave request was a sick day. Hedlund's email stated, "I consider it a sick day due to the stress that I am experiencing over the issues currently going on in the DCI/DPS." Hedlund subsequently provided a doctor's letter excusing him from work April 30 through May 6.
On May 1, Hedlund was placed on administrative leave with pay and provided a notice of investigation. The notice alleged Hedlund engaged in various acts of misconduct during the previous month. That day, the PSB notice of investigation was delivered to Hedlund's home by Meyers, Assistant Director of Field Operations David Jobes, and Sergeant Wes Niles. Hedlund was relieved of his state-issued phone, car keys, service weapon, and various other items. On May 14, Hedlund was ordered to attend a fitness-for-duty evaluation. Hedlund was declared fit for duty at that time.
PSB investigators interviewed Hedlund on June 19. On July 17, PSB issued a 500-page report of its investigation. It found Hedlund engaged in multiple acts of insubordination. That same day, Paulson terminated Hedlund. The termination alleged Hedlund engaged in unbecoming or prohibited conduct, violated the courteous behavior rule, and improperly used state property. The termination also included a notice of right to appeal in accordance with Iowa Code section 80.15.[3]
On July 18, Governor Branstad held a press conference. Governor Branstad addressed several matters, including Hedlund's termination. In response to a press question about the relationship between Hedlund's employment issues and any "morale issues" at DPS, Governor Branstad stated, "They [DPS] felt for the morale and for the safety and well-being of the Department, this was action that was necessary." When asked if the termination was required, Governor Branstad responded he believed the action was "a fair and just decision."
*715 On August 8, Hedlund filed a petition in district court and alleged wrongful discharge in violation of public policy and violation of Iowa Code chapter 70A.[4] On August 13, Hedlund filed an appeal with the Employment Appeal Board (EAB) pursuant to Iowa Code section 80.15. On January 16, 2014, Hedlund voluntarily dismissed his EAB appeal prior to the evidentiary hearing. EAB granted the dismissal on January 22. Pursuant to this dismissal, DPS notified Hedlund his termination would be effective January 30.
On January 23, Hedlund filed a complaint with the Iowa Civil Rights Commission. Hedlund indicated he was discriminated against based on his age. Hedlund indicated he suffered two adverse actions-"disciplined/suspended" and "terminated." He did not claim he had been "forced to quit/retire" or "harass[ed]." The complaint named DPS and Meyers as the actors.
On January 29, one day before his termination would have become effective, Hedlund filed an application with the Peace Officers' Retirement System (PORS) for retirement benefits. The PORS Board approved Hedlund's application effective February 17. By retiring, Hedlund preserved $94,000 worth of his sick leave balance.
Defendants filed a motion to dismiss Hedlund's district court claims. The district court granted the motion with regard to Hedlund's claim of wrongful discharge in violation of public policy. Hedlund filed a motion to amend the district court's dismissal ruling. The district court denied his motion to amend. Hedlund then filed an application for interlocutory review with this court. On February 26, 2016, we dismissed his appeal. Hedlund v. State , 875 N.W.2d 720 (Iowa 2016). On October 5, 2017, defendants filed a motion for summary judgment on all remaining claims. The district court granted the motion and dismissed Hedlund's entire case. Hedlund appealed the district court's ruling; we retained the appeal.
II. Standard of Review.
We review a district court's grant of summary judgment for correction of errors at law. Linn v. Montgomery , 903 N.W.2d 337, 342 (Iowa 2017). Summary judgment is appropriate only when the record shows no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3). We view the summary judgment record in a light most favorable to the nonmoving party. Phillips v. Covenant Clinic , 625 N.W.2d 714, 717 (Iowa 2001) (en banc). "The court must also consider on behalf of the nonmoving party every legitimate inference that can be reasonably deduced from the record." Id. at 717-18. "Even if the facts are undisputed, summary judgment is not proper if reasonable minds could draw different inferences from them and thereby reach different conclusions." Banwart v. 50th St. Sports, L.L.C. , 910 N.W.2d 540, 544-45 (Iowa 2018) (quoting Clinkscales v. Nelson Sec., Inc. , 697 N.W.2d 836, 841 (Iowa 2005) (per curiam)). Therefore, our review is "limited to whether a genuine issue of material fact exists and whether the district court correctly applied the law." Pillsbury Co. v. Wells Dairy, Inc. , 752 N.W.2d 430, 434 (Iowa 2008).
III. Analysis.
Hedlund raises three issues. First, Hedlund argues the district court erred in *716 granting summary judgment on his section 70A.28 whistleblower claim. Second, Hedlund claims the district court erred in denying his age discrimination claim. Lastly, Hedlund contends the district court erred in granting summary judgment on the outrageousness prong of his claim for intentional infliction of emotional distress.
A. Whistleblower.
1. Civil action. The issue before us concerns the availability of remedies under two distinct Iowa Code provisions. Iowa Code section 70A.28[5] and Iowa Code section 80.15 each address adverse employment action against state employees. Hedlund seeks the remedy of section 70A.28, commonly known as Iowa's whistleblower statute. See Iowa Code § 70A.28. We must decide whether Hedlund's direct civil action is precluded by the availability of section 80.15.
Last term this court decided Walsh , 913 N.W.2d 517. We addressed the statutory framework of Iowa's whistleblower statute and parsed the "151-word linguistic jungle" to reveal the relevant portion,
A person shall not discharge an employee ... as a reprisal ... for a disclosure of any information by that employee to a member or employee of the general assembly ... or a disclosure of information to any other public official or law enforcement agency if the employee reasonably believes the information evidences a violation of law or rule ....
Walsh , 913 N.W.2d at 521 (quoting Iowa Code § 70A.28(2) ). Walsh-and now Hedlund-relied on language in the whistleblower statute allowing the provisions of section 70A.28(2) to "be enforced through a civil action." Id. at 521, 524 (quoting Iowa Code § 70A.28(5) ).
A potential alternative to section 70A.28(5) 's civil action is found in Iowa Code section 80.15. It provides the statutory framework for discipline and dismissal of peace officers within DPS. The relevant portion states,
After the twelve months' service, a peace officer of the department ... is not subject to dismissal, suspension, disciplinary demotion, or other disciplinary action resulting in the loss of pay unless charges have been filed with the department of inspections and appeals and a hearing held by the employment appeal board ... if requested by the peace officer, at which the peace office has an opportunity to present a defense to the charges. The decision of the appeal board is final, subject to the right of judicial review in accordance with the terms of the Iowa administrative procedure Act, chapter 17A.
Iowa Code § 80.15. Hedlund fits squarely within this definition. It is the defendants' position that section 80.15, and therefore the administrative remedy under chapter 17A, is the exclusive means to seek judicial review. We disagree. Our holding in Walsh is controlling. See Walsh , 913 N.W.2d at 525.
Section 80.15 is not the exclusive means for Hedlund to seek remedy. Iowa Code section 70A.28(5) "expressly creates an independent cause of action in the alternative to administrative remedies under Iowa Code chapter 17A." Id. We have previously emphasized " section 70A.28 established 'a public policy against retaliatory discharge of public employees and considers the violation of the policy to be a public harm.' " Id. at 524 (quoting *717 Worthington v. Kenkel , 684 N.W.2d 228, 231, 233 (Iowa 2004) (allowing section 80.15 employee to seek injunctive relief under section 70A.28(5)(b ) )). Because the legislature expressly created section 70A.28(5) as an independent statutory cause of action, a challenge to agency action under the administrative procedure act is not the exclusive means of obtaining judicial review. See id. at 525. Hedlund may seek judicial review of DPS action through 70A.28(5)'s civil action. "To hold otherwise would eliminate a choice of remedies that the legislature expressly created." Id. The district court erred in granting summary judgment against Hedlund's 70A.28 claim.
2. Conduct covered by section 70A.28. The district court granted defendants' summary judgment before reaching the merits of Hedlund's section 70A.28 whistleblower claim. It is defendants' position summary judgment remains appropriate because Hedlund did not satisfy the statutory requirements of his claim. To engender the whistleblower's statutory remedy, Hedlund must disclose information to a "public official or law enforcement agency" and reasonably believe "the information evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety." Iowa Code § 70A.28(2). Hedlund asserts reasonable minds could draw different inferences and reach different conclusions with respect to whom the disclosures of information were made and whether the information evidences a type of wrongdoing. When viewing the evidence in the light most favorable to Hedlund and drawing all legitimate inferences therefrom, we agree summary judgment is not appropriate.
The parties do not dispute Hedlund made three separate disclosures. The first two disclosures were complaints Hedlund filed with PSB. The third disclosure was Hedlund's April 29 email to Paulson and Meyers. Defendants articulate such disclosures were not made to a qualifying public official or law enforcement agency. Hedlund indicates that PSB, as part of DPS, is a proper law enforcement agency, and that the April 29 email to Paulson and Meyers was directed to London, the commissioner of DPS. At minimum, we determine the commissioner of DPS qualifies as a law enforcement agency under the whistleblower statute. See Iowa Code §§ 80.1, .2, .9 (creating DPS and establishing "[i]t shall be the duty of the department to prevent crime, to detect and apprehend criminals, and to enforce such other laws as are hereinafter specified"). Therefore, Hedlund has shown reasonable minds could differ as to whether he made disclosures to the proper entities.
Defendants also contend that Hedlund is nothing more than a "chronic complainer" and that his disclosures are not whistleblowing. See Blackburn v. United Parcel Serv. Inc. , 3 F. Supp. 2d 504, 517 (D.N.J. 1998). But when affording Hedlund every legitimate inference, summary judgment is improper as to whether the information evidences a type of wrongdoing. Hedlund's PSB complaints concerned, among other things, his supervisors' condoned misuse of agent time off and the encouragement to ignore lawfully issued parking citations. Further, Hedlund's April 29 email recounted "the [well-known] dangers of traveling at a high rate of speed" and how the speeding state vehicle "can quickly put others at risk." This information is not some trivial matter or a subjective disagreement with the actions of a supervisor; the disclosures could reasonably evidence "a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety." Iowa Code § 70A.28(2) ; see also *718 Fraternal Order of Police, Lodge 1 v. City of Camden , 842 F.3d 231, 241 (3d Cir. 2016) (disagreeing with defendant's view that police officers were "chronic complainers" and "squeaky wheels"). Hedlund has again demonstrated reasonable minds could reach different conclusions on whether his disclosure of information evidences the statutory requirements of Iowa Code section 70A.28(2).
3. Recovery under section 70A.28. Upon remand, Hedlund asserts he is entitled to a jury trial and damages for emotional distress. Although the district court did not reach the stated issues, the parties extensively addressed each issue during the summary judgment proceeding. We address the issues in tandem.
Generally, there is no right to a jury trial for cases brought in equity. Weltzin v. Nail , 618 N.W.2d 293, 296 (Iowa 2000) (en banc). "[L]aw issues are for the jury and equity issues are for the court." Westco Agronomy Co. v. Wollesen , 909 N.W.2d 212, 225 (Iowa 2017). To determine a proceeding as legal or equitable, we look to the pleadings, relief sought, and nature of the case. Carstens v. Cent. Nat'l Bank & Tr. Co. of Des Moines , 461 N.W.2d 331, 333 (Iowa 1990) ("The fact that an action seeks monetary relief does not necessarily define the action as one at law."). Hedlund's petition seeks relief pursuant to subsection 5(a ) of the whistleblower statute. This states,
A person who violates subsection 2 is liable to an aggrieved employee for affirmative relief including reinstatement, with or without back pay, or any other equitable relief the court deems appropriate, including attorney fees and costs.
Iowa Code § 70A.28(5)(a ) (emphasis added). "Under the doctrine of last preceding antecedent, qualifying words and phrases refer only to the immediately preceding antecedent, unless a contrary legislative intent appears." Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Shell Oil Co. , 606 N.W.2d 376, 380 (Iowa 2000) (en banc). When we look to the language of section 70A.28(5)(a ), "any other equitable relief" necessarily implies the "affirmative relief" authorized is equitable. Iowa Code § 70A.28(5)(a ) ; see Fjords N., Inc. v. Hahn , 710 N.W.2d 731, 737-38 (Iowa 2006). We also look to the intent of our legislature. Fjords , 710 N.W.2d at 738. We note relief under the Iowa Civil Rights Act provides for actual damages. See Iowa Code § 216.15(9)(a )(8) ("Payment to the complainant of damages for an injury caused by the discriminatory or unfair practice which damages shall include but are not limited to actual damages, court costs and reasonable attorney fees."). If the legislature intended to permit actual damages under the relief of section 70A.28(5)(a ), it would have so provided. See Shumate v. Drake Univ. , 846 N.W.2d 503, 516 (Iowa 2014) (holding that the legislature's "express inclusion" of recovery rights in one provision but not another indicates the omission was intentional). Therefore, the affirmative relief under section 70A.28(5)(a ) is equitable relief.
B. Age Discrimination. At the summary judgment stage, the district court determined Hedlund did not present sufficient evidence "from which a reasonable jury could infer that age must have actually played a role in the employer's decision making process and had a determinative influence on the outcome." Hedlund both challenges the district court's use of the McDonnell Douglas analytical framework at the summary judgment stage and asserts genuine issues of fact exist that he was a victim of age discrimination.
Hedlund charges age discrimination in violation of his rights under chapter 216 of the Iowa Civil Rights Act (ICRA). The ICRA states, in pertinent part,
*719 It shall be an unfair or discriminatory practice for any ... [p]erson to ... discharge any employee, or to otherwise discriminate in employment against any ... employee because of ... age ..., unless based upon the nature of the occupation.
Iowa Code § 216.6(1)(a ). This is a general proscription against discrimination and we "look[ ] to the corresponding federal statutes to help establish the framework to analyze claims and otherwise apply our statute." Casey's Gen. Stores, Inc. v. Blackford , 661 N.W.2d 515, 519 (Iowa 2003). Similarly, in DeBoom v. Raining Rose, Inc. , we acknowledged, "Because the Iowa Civil Rights Act was modeled after Title VII of the United States Civil Rights Act, we turn to federal law for guidance in evaluating the Iowa Civil Rights Act."[6] 772 N.W.2d 1, 10 (Iowa 2009).
To warrant submission of his age discrimination claim to the jury, Hedlund must first establish he was a victim of age discrimination. See Vaughan v. Must, Inc. , 542 N.W.2d 533, 538 (Iowa 1996). This may be accomplished by direct or indirect evidence. King v. United States , 553 F.3d 1156, 1160 (8th Cir. 2009) ("A plaintiff may establish her claim of intentional age discrimination through either direct evidence or indirect evidence."). Hedlund has offered no direct evidence of discriminatory intent;[7] therefore, he must rely on indirect evidence of discriminatory motive. See Smidt v. Porter , 695 N.W.2d 9, 14 (Iowa 2005) (invoking the McDonnell Douglas framework at summary judgment when plaintiff offered no direct evidence of discriminatory intent under the ICRA); Landals v. George A. Rolfes Co. , 454 N.W.2d 891, 893 (Iowa 1990) ("The McDonnell Douglas framework cannot be applied where the plaintiff uses the direct method of proof of discrimination.").
The parties disagree as to the appropriate analytical framework the district court should employ at the summary judgment stage. Hedlund asserts the McDonnell Douglas burden-shifting framework should be abandoned for summary judgment purposes. Defendants contend McDonnell Douglas remains the appropriate analytical framework at summary judgment. See, e.g. , McQuistion v. City of Clinton , 872 N.W.2d 817, 828-29 (Iowa 2015) (applying the McDonnell Douglas framework at summary judgment when indirect evidence is used to infer discrimination under the ICRA); Jones v. Univ. of Iowa , 836 N.W.2d 127, 147-48 (Iowa 2013) (affirming grant of summary judgment under the McDonnell Douglas framework for race and gender discrimination claim under Title VII); Smidt , 695 N.W.2d at 14 (invoking McDonnell Douglas framework because plaintiff offered no direct evidence of discriminatory intent).[8] We do not need to decide this issue because, either way, we conclude that Hedlund has failed to raise a genuine issue of material fact.
*720 Under the familiar McDonnell Douglas burden-shifting framework, Hedlund must carry the initial burden of establishing a prima facie case of age discrimination. McDonnell Douglas Corp. v. Green , 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its employment action. Id. Finally, the burden returns to Hedlund to "demonstrate that the proffered reason is a mere pretext for age discrimination." Rideout v. JBS USA, LLC , 716 F.3d 1079, 1083 (8th Cir. 2013). In other words, "[i]f the employer offers a legitimate nondiscriminatory reason, the plaintiff must show the employer's reason was pretextual and that unlawful discrimination was the real reason for the termination." Deboom , 772 N.W.2d at 6-7 (quoting Smidt , 695 N.W.2d at 15 ); see Iowa Code § 216.6(1)(a ) (It is discriminatory practice for any person "to discharge any employee ... because of the age. " (Emphasis added.)); see also Reeves v. Sanderson Plumbing Prods., Inc. , 530 U.S. 133, 141, 120 S. Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) ("That is, the plaintiff's age must have 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.' " (alterations in original) (quoting Hazen Paper Co. v. Biggins , 507 U.S. 604, 610, 113 S. Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) )).
Under McDonnell Douglas , we can assume that Hedlund made out a prima facie case. Regardless, defendants have produced legitimate nondiscriminatory reasons for Hedlund's termination. Hedlund communicated "negative and disrespectful messages" about DCI and members of its leadership team with his subordinate employees. Further, Hedlund drove a state vehicle to Cedar Rapids for nonwork related purposes and was deceptive about his work status when questioned. Simply put, defendants contend Hedlund was served notice of his termination after he violated multiple DCI departmental rules and regulations.[9] These are legitimate, nondiscriminatory reasons for defendants' actions. Hedlund now retains the ultimate burden of producing evidence from which a reasonable jury could conclude the defendants' proffered reasons were pretextual "and that unlawful discrimination was the real reason for the termination." Smidt , 695 N.W.2d at 15.
To rebut the legitimate nondiscriminatory reasons, Hedlund relies on remarks made by Meyers. Hedlund first contends Meyers in a February 2013 meeting with Hedlund made reference to Hedlund being in the "twilight of his career." Hedlund next contends that Meyers later inquired in a conference call in February 2013 as to when Hedlund and other SAC were planning to retire. The district court concluded such remarks were insufficient to support an inference of age discrimination, and we agree. Employers may make reasonable inquiries into an employee's retirement plan. See Cox v. Dubuque Bank & Tr. Co. , 163 F.3d 492, 497 (8th Cir. 1998) ("[M]any courts have recognized that an employer may make reasonable inquiries into the retirement plans of its employees."); Moore v. Eli Lilly & Co. , 990 F.2d 812, 818 (5th Cir. 1993) (A new supervisor may make "reasonable inquiries about the ages of the members of his work force and their known plans for the future-facts on which to gauge the anticipated longevity of his crew."); Colosi v. Electri-Flex Co. , 965 F.2d 500, 502 (7th Cir. 1992) ("[A] company has a legitimate interest in learning its *721 employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct."). In fact, Hedlund was approaching, if he had not already attained, the permissible statutory retirement age for DPS officers. See Iowa Code § 97A.6(1)(a ) (authorizing retirement with full benefits at fifty-five years of age and twenty-two years of service). At this point, a DPS officer-having dedicated the better part of his or her career to the state's vital public safety mission-may have incentive to retire from DPS and potentially pursue alternative employment.
Moreover, isolated remarks, such as "twilight of his career," are not sufficient on their own to show age discrimination. Forman v. Small , 271 F.3d 285, 293-94 (D.C. Cir. 2001) (remarks referring to plaintiff as "over the hill" and in the "twilight of his career" insufficient to rebut defendant's nondiscriminatory reason for denying plaintiff a promotion). To infer such discriminatory feelings influenced decision makers, we look to "the relevant time in regard to the adverse employment action complained of." Id. ; see Hunt v. City of Markham , 219 F.3d 649, 652 (7th Cir. 2000) (It is possible to infer decision makers were influenced by discriminatory feelings "when the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of."). The remarks alone do not infer that the decision to terminate Hedlund was influenced by discriminatory feelings. The record reveals the reasonableness of Meyers's remarks as well as the remoteness in time. These remarks occurred five months prior to the adverse employment action of which Hedlund complains. Hedlund testified in his deposition as follows:
Q. We've talked a little bit about that meeting, I believe, but in the course of that meeting, you indicate that "AD Meyers stated two or three times during the course of that meeting that Hedlund was in the, quote, twilight of his career, end quote." A. He made reference to me being in the twilight of my career, yes.
Q. Can you put that in context? What were you folks discussing when he made those comments? A. My recollection is he made a comment along the lines of he didn't want to have issues with me because I was in the twilight of my career. That's the best context I can recall it in.
Q. Other than that meeting on February 15, 2013, did Gerard Meyers use those words "twilight of your career" in any other conversations? A. No, not that I recall.
Q. Has Charis Paulson ever used such terms as "twilight of your career" in any conversation she's had with you? A. No.
Meyers similarly explained in his deposition:
Q. On the meeting that you had on February 15, 2013 ... did you make the comment to Hedlund that he was in the twilight of his career? A. Yes, I did.
Q. Did you make that comment to him more than once? A. I believe it was just once.
Q. Did you make any-did you ever discuss with Hedlund when he was going to retire? A. Yes. I believe when I mentioned the twilight of his career, I was referring to his longevity and the ability that he had to rather than work cases, mentor personnel within his assigned region.
As for the retirement question that you asked, it's my recollection that at some point during this departmental strategic planning effort ... each bureau AD was directed to inquire with any personnel of senior status to determine *722 what their plans may be since we have a very young division and we were struggling to maintain the necessary institutional knowledge and experience.
Remarks of this kind "are remote in time and do not support a finding of pretext for intentional age discrimination." See Walton v. McDonnell Douglas Corp. , 167 F.3d 423, 427-28 (8th Cir. 1999) (affirming summary judgment because plaintiff failed to present sufficient evidence of pretext under McDonnell Douglas with remarks that occurred two years earlier). Taken in a light most favorable to Hedlund, Meyers's remarks occurred five months prior to Hedlund's notice of termination and are insufficient to establish pretext of age animus. See Ortiz-Rivera v. Astra Zeneca LP , 363 F. App'x 45, 48 (1st Cir. 2010) ("[M]ere generalized 'stray remarks' ... normally are not probative of pretext absent some discernable evidentiary basis for assessing their temporal and contextual relevance." (quoting Straughn v. Delta Air Lines, Inc. , 250 F.3d 23, 36 (1st Cir. 2001) )).
Hedlund also attempts to show defendants' asserted reasons for his termination were pretextual by demonstrating Meyers filled Hedlund's position with a somewhat younger employee. Michael Krapfl, a forty-five year old with twenty-five years of law enforcement experience, was promoted into Hedlund's position; Hedlund was fifty-five years old with twenty-five years of law enforcement experience at the time of his termination. Hedlund cites Landals for the proposition that a sufficient inference of discrimination may be drawn when a plaintiff's position is eliminated and a younger employee assumes those responsibilities. 454 N.W.2d at 895. But Landals is an example of specific circumstances allowing for an inference of age discrimination.[10] Generally, evidence that a younger person replaced the plaintiff's position is insufficient to create a reasonable inference of age discrimination. See Tusing v. Des Moines Indep. Cmty. Sch. Dist. , 639 F.3d 507, 520 (8th Cir. 2011) ("This fact, in isolation, is insufficient to create a reasonable inference of age discrimination."); Carraher v. Target Corp. , 503 F.3d 714, 719 (8th Cir. 2007) ("Although [plaintiff] was replaced by someone substantially younger than him, in this case 28 years younger, we have previously held that this fact ... possesses 'insufficient probative value to persuade a reasonable jury that [plaintiff] was discriminated against.' " (quoting Nelson v. J.C. Penney Co. , 75 F.3d 343, 346 (8th Cir. 1996) )). Hedlund does not provide sufficient evidence, beyond indicating an employee, younger by ten years, filled his position, to support that defendants' proffered reasons were mere pretext. The promotion of Krapfl does not cast doubt on defendant's contention that Hedlund was terminated for violating DCI departmental rules and regulations. Cf. Waldron v. SL Indus., Inc. , 56 F.3d 491, 496-97 (3d Cir. 1995) (holding when employer "split [plaintiff's] job, fired him, offered one-half of his former job to a younger person while the other half remained unadvertised, and then recombined the jobs and placed the younger employee in the recombined post" it cast sufficient doubt on plaintiff's discharge *723 as part of the company reorganization).
The promotion of Krapfl also leads Hedlund to assert Meyers would give the lowest promotability scores to the oldest candidates. The summary judgment record indicates four special agents have sought promotion. Yet Hedlund only provided data for three of them: Ray Fiedler, born in 1962; Jim Thiele, born in 1965; and Michael Krapfl, born in 1969.[11] The promotional process includes a written test, interview, and a promotability score. Hedlund argues Fiedler and Thiele, the oldest of the three, received the bottom two promotability scores. Although "subjective promotion procedures are to be closely scrutinized because of their susceptibility to discriminatory abuse," Royal v. Mo. Highway & Transp. Comm'n , 655 F.2d 159, 164 (8th Cir. 1981), Hedlund has not provided any evidence showing Meyers made the promotional decision based on age. The summary judgment record indicates neither Thiele nor Fiedler believe age had anything to do with the promotion. Fiedler's written test score was "probably middle of the pack," and he admitted, "[T]here have been other guys my age promoted." In fact, Thiele did not even apply for Hedlund's vacant position but has taken the written test every year since 2007. There is no evidence sufficient to support an inference of age discrimination based on the promotability scores of the oldest candidates.
Drawing all inferences in Hedlund's favor, Hedlund has failed to present sufficient evidence from which a reasonable jury could infer that defendants' legitimate, nondiscriminatory reason for termination was pretextual and that age discrimination was the real reason for his termination. Our rule governing summary judgment indicates Hedlund "must set forth specific facts showing that there is a genuine issue for trial." Iowa R. Civ. P. 1.981(5). Even with the formulated assistance of the McDonnell Douglas framework, Hedlund has not moved beyond generalities. Slaughter v. Des Moines Univ. Coll. of Osteopathic Med. , 925 N.W.2d 793, 808 (Iowa 2019) ("Summary judgment is not a dress rehearsal or practice run; 'it is the put up or shut up moment in a lawsuit ....' " (quoting Hammel v. Eau Galle Cheese Factory , 407 F.3d 852, 859 (7th Cir. 2005) )).
For similar reasons, we find that there is insufficient evidence to withstand summary judgment outside of the McDonnell Douglas framework. Meyers's comments related to retirement rather than age. They did not show animus toward age. The comments came several months before the termination decision, with many events intervening before that decision, including Hedlund's trip to Cedar Rapids and the report on the Governor's vehicle doing a "hard ninety." This is not enough to allow a reasonable jury to infer that defendants attempted to terminate Hedlund "because of" age.
C. Intentional Infliction of Emotional Distress. In his final argument, Hedlund asserts the individual defendants' conduct was sufficiently egregious to satisfy the outrageousness prong of his intentional infliction of emotional distress claim. For the following reasons, we disagree.
To succeed on this claim, Hedlund must demonstrate four elements:
(1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's *724 outrageous conduct was the actual and proximate cause of the emotional distress.
Smith v. Iowa State Univ. of Sci. & Tech. , 851 N.W.2d 1, 26 (Iowa 2014) (quoting Barreca v. Nickolas , 683 N.W.2d 111, 123-24 (Iowa 2004) ). Hedlund must establish a prima facie case for the outrageous conduct element. Id. For emotional distress cases, "it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." Cutler v. Klass, Whicher & Mishne , 473 N.W.2d 178, 183 (Iowa 1991) (quoting M.H. by and through Callahan v. State , 385 N.W.2d 533, 540 (Iowa 1986) ). Here, the district court determined Hedlund's evidence was insufficient to rise to the level of outrageous conduct.
The standard of outrageous conduct "is not easily met, especially in employment cases." Van Baale v. City of Des Moines , 550 N.W.2d 153, 157 (Iowa 1996), abrogated on other grounds by Godfrey v. State , 898 N.W.2d 844, 864, 872 (Iowa 2017). We have said the outrageous conduct "must be extremely egregious; mere insults, bad manners, or hurt feelings are insufficient." Id. at 156.
Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.
Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
Northrup v. Farmland Indus., Inc. , 372 N.W.2d 193, 198 (Iowa 1985) (en banc) (quoting Restatement (Second) of Torts § 46 cmt. d, at 73 (Am. Law Inst. 1965)). We require substantial evidence of extreme conduct. Vinson v. Linn-Mar Cmty. Sch. Dist. , 360 N.W.2d 108, 118 (Iowa 1984).
"When evaluating claims of outrageous conduct arising out of employer-employee relationships, we have required a reasonable level of tolerance. Every unkind and inconsiderate act cannot be compensable." Vaughn v. Ag Processing, Inc. , 459 N.W.2d 627, 636 (Iowa 1990) (en banc) (citation omitted). "Despite our caselaw that indicates an employer 'has a duty to refrain from abusive behavior toward employees,' we have often found that conduct by employers and coworkers did not rise to the level of outrageous conduct." Smith , 851 N.W.2d at 26 (quoting Vinson , 360 N.W.2d at 118 ); see, e.g. , Fuller v. Local Union No. 106, United Bhd. of Carpenters , 567 N.W.2d 419, 421, 423 (Iowa 1997) (determining "in no way could the conduct alleged here qualify" as outrageous conduct after fellow union members filed a false police report of plaintiff's intoxicated driving that led to union's violation of plaintiff's contractual rights); Van Baale , 550 N.W.2d at 155, 157 (holding police officer's termination did not amount to outrageous conduct after his supervisor recanted the "guarantee" to continued employment if he entered guilty and nolo contendere pleas on a domestic abuse charge instead of proceeding to trial as initially planned); Reihmann v. Foerstner , 375 N.W.2d 677, 681 (Iowa 1985) (agreeing the record did not contain substantial evidence of outrageous conduct when supervisor used his influence to move plaintiff's office to a different city).
In Vinson , we determined an employer's eight-step "campaign of harassment" was not conduct sufficient to "[rise] to the level of extremity essential to support a finding of outrageousness." 360 N.W.2d at 119. After questioning the school district's seniority *725 policy, the plaintiff was singled out for "special scrutiny." Id. The campaign included accusing the plaintiff of falsifying time records, discharging her on the ground of dishonesty, and reporting the incident to a prospective employer despite "knowing the report would be so received and harm plaintiff's chance of being employed, and knowing that plaintiff had not acted dishonestly." Id. We determined a jury could find the actions as "petty and wrong, even malicious," but we did not believe "the conduct went beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community." Id.
We have held certain conduct sufficiently outrageous. That was the special circumstances of Smith , 851 N.W.2d at 28-29. There, the case "presente[d] the confluence of several factors" that "exceeded a 'deliberate campaign to badger and harass' Smith and crossed the line into outrageous conduct." Id. at 28 (quoting Vinson , 360 N.W.2d at 119 ). "The conduct included, but also went beyond, typical bad boss behavior such as discrimination in pay, isolation of the employee, removal of the employee from work assignments, misrepresentations about promotions, and even falsification of records." Id. at 29. Although "the issue [was] a close one," Smith involved a striking, "unremitting psychological warfare ... over a substantial period of time." Id. at 28-29. Smith's supervisor treated him as a mentally unstable outcast in order to cover up what amounted to her theft from the university. Id. at 29.
Hedlund positions his case as distinct from "typical bad boss behavior" and more akin to an "unrelenting campaign" to destroy his life and career. Specifically, Hedlund focuses on two behaviors. He first claims defendants deliberately endangered lives when DPS arrived at his house to place him on administrative leave. Based on our review of the summary judgment record, we agree with the district court's conclusion that this behavior did not rise to the level of outrageous conduct. It is typical practice for DPS to place an individual on administrative leave pending a fitness-for-duty evaluation. The record indicates Paulson met with a representative from PSB, the department of administrative services, and the attorney general's office to discuss appropriate actions regarding Hedlund's escalating behavior. Paulson and Meyers were concerned for their own safety as well as Hedlund's personal safety. It was determined, therefore, the most appropriate action was administrative leave pending a fitness-for-duty evaluation. Notably, Hedlund was placed on leave without incident.
Hedlund also alleges his supervisors repeated known falsehoods, regarding his threat to public safety, to Governor Branstad knowing the Governor would broadcast the falsehoods statewide. According to Hedlund, this led to his humiliation in front of coworkers, peers, and the community. We are not persuaded. Even when viewed in the light most favorable to Hedlund, this case is most similar to Vinson' s deliberate campaign to badger and harass. The comment by the Governor stating, "[DPS] felt for the morale and for the safety and well-being of the Department, this was action that was necessary," is not substantial evidence of conduct "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Vinson , 360 N.W.2d at 118 (quoting Harsha v. State Sav. Bank , 346 N.W.2d 791, 801 (Iowa 1984) ).
In addition, we do not believe the conduct Hedlund endured is comparable to unremitting psychological warfare over a substantial period of time. See *726 Smith , 851 N.W.2d at 29 ("[T]he conduct included, but also went beyond, typical bad boss behavior .... What is striking ... [was the] unremitting psychological warfare against Smith over a substantial period of time."). A jury could find certain aspects of the defendants' actions as petty, wrong, or even malicious. But this would not lead an average member of the community to arouse resentment against the defendants and to exclaim, "Outrageous!"
The district court determined the individual defendants were entitled to summary judgment on this issue. We find no error with this conclusion.
IV. Conclusion.
For the aforementioned reasons, the judgment of the district court is affirmed in part and reversed in part. Specifically, we affirm the district court's grant of summary judgment with regard to Hedlund's claims of age discrimination and intentional infliction of emotional distress. We reverse the district court's grant of summary judgment with regard to Hedlund's whistleblower claim. We remand to the district court for further proceedings.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
All justices concur except Appel, J., and Cady, C.J., and Wiggins, J., who concur in part and dissent in part.

Hedlund only claimed one hour of vacation on April 26.

Paulson contacted Hedlund on the morning of April 29 to reschedule their meeting. The record does not indicate whether the rescheduled meeting occurred.

Hedlund continued to receive full salary and benefits until the conclusion of the appeal. See Iowa Code § 80.15.

Hedlund subsequently amended his petition to include the claims of intentional infliction of emotional distress and age discrimination.

Amended in 2019, Iowa Code section 70A.28(5)(a ) now includes "civil damages in an amount not to exceed three times the annual wages and benefits received by the aggrieved employee prior to the violation of subsection 2."

Although we have consistently applied federal guidance when interpreting the ICRA, "the decisions of federal courts interpreting Title VII are not binding upon us in interpreting similar provisions in the ICRA." Estate of Harris v. Papa John's Pizza , 679 N.W.2d 673, 678 (Iowa 2004).

Direct evidence "show[s] a specific link between the alleged discriminatory animus and the challenged decision." Griffith v. City of Des Moines , 387 F.3d 733, 736 (8th Cir. 2004) (quoting Thomas v. First Nat'l Bank of Wynne , 111 F.3d 64, 66 (8th Cir. 1997) ).

In Hawkins v. Grinnell Regional Medical Center , 929 N.W.2d 261, 272 (Iowa 2019), where an age discrimination case went to trial, we held that "we no longer rely on the McDonnell Douglas burden-shifting analysis and determin[ing]-factor standard when instructing the jury." We did not disturb our prior law as it applies to summary judgment.

We note the notice of termination indicates Hedlund engaged in unbecoming or prohibited conduct, violated the courteous behavior rule, and improperly used state property.

In Landals , the plaintiff was required to undergo a physical examination or face discharge after he complained of chest pains, the company president specifically ordered plaintiff's lay off a month prior, and plaintiff was terminated without any reason. 454 N.W.2d at 895. Furthermore, the fifty-two-year-old plaintiff, who had been with the company for approximately twenty-five years, was "an extremely competent and dedicated employee." Id. His duties were assumed by a twenty-five-year-old employee, who had been with the company for six months, and a thirty-six-year-old employee, "who had been with the company for approximately one year." Id.

Hedlund was born in 1957.