**IN THE COURT OF APPEALS OF IOWA**

No. 22-1012
Filed July 13, 2023


**BETH M. AVERY,**
  Plaintiff-Appellant,

**vs.**

**IOWA DEPARTMENT OF HUMAN SERVICES, STATE OF IOWA and MICHAEL McINROY,**
  Defendants-Appellees.
_____


  Appeal from the Iowa District Court for Polk County, Michael D. Huppert,

Judge.


  Beth Avery appeals the entry of adverse summary judgment on her claims

of sex and sexual-orientation discrimination against the Iowa Department of

Human Services, now known as the Iowa Department of Health and Human

Services. **AFFIRMED.**


  Eric M. Updegraff, Brent L. Hinders, and Alex S. Dornacker of Hopkins &

Huebner, P.C., Des Moines, for appellant.

  Brenna Bird, Attorney General, Eric Wessan, Solicitor General, and Kayla

Burkhiser Reynolds and Job Mukkada, Assistant Attorneys General, Des Moines,

for appellees.


  Heard en banc, but decided by Bower, C.J., and Tabor, Greer, Schumacher,

Ahlers, Badding, Chicchelly, and Buller, JJ.

**BOWER, Chief Judge.**

Beth Avery appeals the district court's grant of summary judgment to the Iowa Department of Health and Human Services (HHS)[1] and Michael McInroy on her claims of sex and sexual-orientation discrimination following her 2016 termination from employment.  On our review of the summary judgment record, we find no error of law or reason to modify the district court's ruling.  We therefore affirm.

**I. Background.**

In 2016, Avery was a staff supervisor of social workers who conducted child and adult protective assessments for HHS.  Her immediate supervisor was McInroy, a service area manager.  LaVerne Armstrong was the HHS division administrator for field operations.

In December 2016, Avery was terminated by HHS after an investigation into her supervision of the social worker assigned to do a child protective assessment (CPA) of a child who died while the assessment remained open.  Avery filed claims asserting HHS violated the Iowa Civil Rights Act (ICRA), Iowa Code section 216.6 (2016), in a number of respects.  This appeal concerns only her claims of discrimination based on sex and sexual orientation.

Under the ICRA, it is "an unfair or discriminatory practice . . . to discharge any employee, or to otherwise discriminate in employment . . . because of the age, race, creed, color, *sex*, *sexual orientation*, gender identity, national origin, religion,

---

[1] The Department of Human Services recently merged with the Department of Public Health resulting in what is now known as the Iowa Department of Health and Human Services.

or disability of such applicant or employee, unless based upon the nature of the occupation." Iowa Code § 216.6(1)(a) (emphasis added).

Avery asserts summary judgment is inappropriate here because there are genuine issues of fact whether her sex or sexual orientation was a motivating factor for the decision to terminate her employment.

## II. Scope and Standard of Review.

Our review of a grant of summary judgment is for correction of errors at law. *Hedlund v. State*, 930 N.W.2d 707, 715 (Iowa 2019). A grant of summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, "shows no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.*; Iowa R. Civ. P. 1.981(3). "Even if the facts are undisputed, summary judgment is not proper if reasonable minds could draw different inferences from them and thereby reach different conclusions." *Hedlund*, 930 N.W.2d at 715 (citation omitted).

## III. Discussion.

A plaintiff can prove discrimination under the ICRA by direct or indirect evidence. *Id.* at 719. In *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 538 (Iowa 1996), our supreme court held: "The *Price Waterhouse*[2] method is used when direct or circumstantial evidence is presented which tends to establish [the claimant's status as a member of a protected group] was a determining factor in the employment

---

[2] *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989), *superseded by statute*, *as stated in Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1017 (2020).

decision.  The *McDonnell Douglas*[3] method is an indirect burden shifting framework."  (Internal citation omitted.)

> On the direct evidence track, "[a]fter the direct evidence has been presented [by the plaintiff], the employer then bears the burden of establishing by a preponderance of the evidence it would have made the same decision even in absence of the improper motive."  But direct evidence of a discriminatory motive is rarely trumpeted by the employer and is almost never available.

*Stansbury v. Sioux City Cmty. Sch. Dist.*, No. 21-0864, 2022 WL 2824284, at *4 (Iowa Ct. App. July 20, 2022) (alterations in original) (internal citation omitted).

Recently our supreme court modified the *McDonnell Douglas* framework concerning summary judgment in ICRA discrimination claims resting on indirect evidence.  *See Feeback v. Swift Pork Co.*, 988 N.W.2d 340, 347 (Iowa 2023).  The court explained:

> We do so to align the summary judgment test with the mixed-motive causation standard and the same-decision defense at trial.  Under our modified *McDonnell Douglas* test, employees "must carry the initial burden of establishing a prima facie case of [sex] discrimination."  Employees do so by showing that they are members of a protected group [(i.e., due to their sex or sexual-orientation)], were qualified for their positions, and the circumstances of their discharge raised an inference of discrimination.  Then, the employer must "'articulate some legitimate, nondiscriminatory reason' for its employment action."  At that point, the burden shifts back to the employee to demonstrate the employer's proffered reason is pretextual or, while true, was not the only reason for [their] termination and that [their sex or sexual-orientation] was another motivating factor.

*Id.* at 347–48 (footnote and internal citations omitted).

The district court's analysis employed this approach:

> That "familiar" analysis places upon Avery the initial burden of production to generate a genuine issue as to whether there is a prima facie claim of such discrimination.  The elements of a prima facie

---

[3] *McDonnell Douglas v. Green*, 411 U.S. 792, 802–03 (1973).

claim are: (1) she is a member of a protected class; (2) she was performing the work satisfactorily; and (3) she suffered an adverse employment action. In the event a question of material fact is raised as to a prima facie claim, the burden of production then shifts to the defendants to raise a genuine issue of fact as to a legitimate, nondiscriminatory reason for the termination. Finally, should the defendants articulate such a reason, the burden then shifts back to Avery to establish a genuine issue of fact as to whether the employer's reason was pretextual and that unlawful discrimination was the real reason for the termination.

The trial court concluded the undisputed facts showed Avery had met her initial burden of establishing a prima facie discrimination claim and that HHS gave a legitimate, nondiscriminatory reason for her termination. Thus, the burden shifted back to Avery to establish a genuine issue of fact as to whether HHS's reason was pretextual. *See Feeback*, 988 N.W.2d at 348.

HHS and McInroy assert Avery's termination was warranted due to shortcomings in Avery's supervision of social workers, which was discovered after an investigation into the death of a child, N.F., and a review of twenty other randomly selected cases under Avery's supervision.

N.F. came to the attention of HHS in May 2016, and a CPA was opened. HHS was notified in October 2016 that N.F. had died. The CPA remained open, but the time the CPA had been open was much longer than normally expected.

HHS opened an investigation into the social worker assigned to conduct the CPA, Amy Sacco, and Sacco's supervisor, Avery, to determine whether there had been any violations of HHS work rules, policies, or procedures in handling the case. The investigation was conducted by a "leadership team" that included Armstrong; McInroy; Kristin Konchalski, a social worker administrator and Avery's direct supervisor between February 2015 and December 2016; Tracy White, also

a social worker supervisor; Pauline Rutherford, a business manager for HHS; and Vicki Hendershot, Rutherford's peer and a business manager asked to participate in the interviews as a neutral third-party from outside the Des Moines service area.

Both Avery and Sacco were interviewed twice; in addition, a random audit was conducted of twenty other cases assigned to Avery. During her interviews with Rutherford, White, and Hendershot, Avery admitted she failed to adhere to HHS's policies, procedures, and best practices. The investigators found that Avery and Sacco violated HHS's code of conduct and work rules in N.F.'s case and seven others when they failed to follow HHS's policies, procedures, best practices, and the guidelines contained in HHS manuals.

Armstrong, Rutherford, White, McInroy, and Konchalski met on several occasions to discuss the ongoing investigation and the investigators' findings. The group agreed that "they had never seen a case like this, that it was egregious, and that termination was warranted." HHS asserts no single person made the decision to terminate Avery's employment, but the ultimate authority to make the termination decision rested with Armstrong.

Avery's employment with HHS was terminated on December 16, 2016. In a letter issued that date Avery was advised, "This action is being taken following an investigation of your supervision of a particular employee. Review of that employee's cases revealed [seven] in which your actions, or lack thereof, affected the course of these cases and/or ultimately the safety of children."

Avery claims McInroy drove the termination decision based on his bias against women and lesbians. Avery points to an interrogatory signed by McInroy

during the proceeding dealing with her grievance with the Iowa Public Employment Relations Board that he "ultimately decided to terminate [Avery's] employment."

Avery also notes White's deposition testimony that McInroy routinely commented on Avery's sexuality; according to White, McInroy would often state that he did not want to picture Avery and her partner (also an HHS employee) having sex and that it would bring unwanted "drama" into the workplace if both Avery and her partner were promoted to supervisors "because lesbians break up and move and cause drama." Avery also points to White's testimony that McInroy favored people he liked and were loyal to him.

In her brief, Avery asserts:

> Tracy White's testimony in this case speaks to a pattern of "routine" animosity based on Avery's sexual orientation and [sex] that a reasonable jury could find to have contributed to McInroy's decision making and ultimately terminating Avery. White testified that, along with details of a few specific events, the instances of disparaging comments about Avery and her partner were so routinely made that she could not keep track of all of the times they occurred. Summary judgment should not be granted just because White cannot point to a single, detailed, event close enough to Avery's termination based on her testimony.
> There is testimony that McInroy had an "in crowd" and an "out crowd" at [HHS] while Avery was employed there. Avery was clearly in the "out crowd," meaning she was treated differently and was wholly disliked or hated by McInroy. A reasonable jury could make an inference that, with all the evidence in the record regarding Avery's treatment at the hands of McInroy, these sexist and homophobic comments likely continued up until Avery's termination and were routine circumstances of the workplace where Avery worked and therefore was a factor in her being in the "out crowd", as well as being a factor in the decision to terminate.

Avery argues it is for a jury to decide White's credibility.

In *Feeback* our supreme court noted, "[A] common approach to show pretext is to introduce evidence that the employer treated similarly-situated

employees in a disparate manner." 988 N.W.2d at 350 (citation omitted). It cautioned the test for whether someone is sufficiently similarly situated "is rigorous." *Id.*; *see, e.g.*, *Gardner v. Wal-Mart Stores, Inc.*, 2 F.4th 745, 750 (8th Cir. 2021) (noting "individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances" (citation omitted)). Our supreme court determined the claimant "must prove he [or she] and the other employees were similarly situated in all relevant respects." *Feeback*, 988 N.W.2d at 350 (internal quotation marks and citation omitted). But the claimant "need not show the other employees committed 'the exact same offense'[; r]ather, he must establish that he 'was treated differently than other employees whose violations were of *comparable seriousness*.'" *Id.* (internal citations omitted).

The district court wrote:

> The showing of pretext necessary to survive summary judgment requires more than merely discrediting the employer's proffered reason for the adverse employment decision. Avery's protected class must have actually played a role in the employer's decision-making process and had a determinative influence on the outcome. A material question of fact regarding pretext can be demonstrated in at least two ways: (1) by showing that the employer's explanation is unworthy of credence because it has no basis in fact; or (2) by persuading the court that a prohibited reason more likely motivated the employer. The court's inquiry is limited to whether the employer gave an honest explanation of its behavior; it should not "sit as a super-personnel department that reexamines an entity's business decisions."
> Avery does not argue that the stated reason for her termination is unworthy of credence; rather, she focuses on the claimed discriminatory animus harbored against her by McInroy and its purported impact on the decision-making process. Discriminatory comments by decisionmakers can be used to show pretext. In order to infer that decision makers were influenced by discriminatory feelings, the relevant time is in regard to the adverse employment action complained of; such an inference is possible when the

decision makers themselves, or those who provide input into the decision, express such feelings around the time of, and in reference to, the adverse employment action complained of.

Taking the record in a light most favorable to Avery, it is clear that McInroy did harbor feelings that were not favorable to her, and made statements accordingly. Not all of these feelings or statements were tied to her status within a protected class, however; by her own admission, she believed that the source of this friction stemmed from their shared pursuit of a supervisory job (to the degree any reason was given at all). Likewise, the adversarial nature of the [HHS] investigation and the claim that Avery "had a target on her back" long before the N.F. case have not been tied to any improper discriminatory motive; to the contrary, the nature of the investigation and its ultimate conclusion are undisputedly tied to only the circumstances of the N.F. case.

. . . .

Even with the benefit this court must afford Avery in light of the nature of the present motion, she has failed to generate a material issue of fact on whether the stated reason for her termination was pretextual and that the decision to terminate her was actually motivated by improper discrimination. As a result, the court concludes that the defendants' motion for summary judgment should be granted and this case dismissed.

On our review of the summary judgment record, we find no error of law or reason to modify the district court's ruling. We therefore affirm.

**AFFIRMED.**