# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-2655

_____

Winfred G. Beasley

*Plaintiff - Appellant*

v.

Warren Unilube, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Jonesboro

_____

Submitted: June 12, 2019
Filed: August 9, 2019

_____

Before GRUENDER, STRAS, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

Winfred Beasley, an African American, claims that Warren Unilube, Inc. (Warren) fired him because of his race in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and 42 U.S.C. § 1981. The district court[1] granted Warren's motion for summary judgment. We affirm.

I.

Warren produces motor oil and other automotive lubricants. Beasley started working as the Quality Assurance Manager at Warren in October 2012. He was generally responsible for creating and implementing systems to safeguard the quality of Warren's products. Beasley's primary job was to ensure that all products went into the correct bottles and boxes with appropriate labeling and caps. He supervised several quality inspectors who would conduct regular checks on Warren's assembly lines to detect problems. He was also responsible for troubleshooting, containing, and correcting any issues that developed. Finally, Beasley was required to handle the annual audit of Warren's quality control systems by the International Standards Organization (ISO).

Beasley was not the only one at Warren responsible for product quality. The Lab Manager, Ben Heater, and his assistants verified that the oil (or other product) met appropriate specifications. Maintenance personnel calibrated the equipment at the plant. The transportation department ensured that products were delivered on time and not damaged in transit. And although the Operations Manager—who for much of Beasley's tenure was Rusty Brown—was primarily focused on production efficiency, he also impacted product quality since Beasley relied on Brown's team to implement many of his recommendations.

Up to this point the parties agree. But they part ways when it comes to the circumstances surrounding Beasley's termination. Warren alleges that multiple factors figured into this decision: a series of customer complaints, Beasley's poor

---

[1] The Honorable D.P. Marshall, Jr., United States District Judge for the Eastern District of Arkansas.

showing during the annual ISO audit, and concerns about his organizational skills. Beasley disputes much of this. Because this appeal arises in the context of a motion for summary judgment, we construe the facts in a light most favorable to him. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). Beasley "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Nor can he rely on mere "allegations or denials." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2011). But to the extent the parties' accounts of what happened genuinely diverge, we follow Beasley.

There were roughly three sets of customer complaints during Beasley's tenure. The first set came in 2013 from AutoZone, one of Warren's primary customers. On four occasions, AutoZone reported that Warren's products were labeled or packaged incorrectly. The underlying cause of these failures appears to have been two pieces of equipment that either maintenance or operations personnel had improperly calibrated. Beasley concedes that his team might have been able to catch or correct these problems, but he notes that these complaints occurred before his quality control systems had been fully implemented.

Warren received a second set of complaints in February 2015. Though Warren's products met appropriate performance specifications during this period, some contained too much red dye and others had a foul odor. Beasley investigated these problems and concluded that both resulted from mistakes in the oil blending process. Beasley states that he was not to blame for these problems, which would have fallen under the purview of Billy Moore, the Blending Manager. He also states his team could not have detected the issues because the oil was already bottled when it reached quality control.

Warren received a third set of complaints, this time about leaky bottles, throughout the spring of 2015. The leaks were caused by Warren's bottle capping

machine, which was either improperly calibrated or was not the proper machine to use for the job. Warren's President at the time, Steve Estok, admits that the responsibility for this problem fell partly on operations personnel and the Maintenance Manager, Shawn Jamieson. Beasley also shared some blame according to Estok, because he should have been inspecting the amount of torque that the machine was applying. Beasley disputes this, stating that he had informed Estok that the company needed different or additional equipment.

Around this same time, Beasley was preparing for the annual ISO audit. In prior years, Warren had passed the audit without any problems. In May 2015, however, the auditor identified six minor deficiencies. Estok also says that the auditor was especially critical of Beasley, stating that he was "not capable of doing this job" and that Warren's quality control program was "progressively getting worse." App. 616. Estok further claims that the auditor told him Warren might lose its ISO certification if Warren did not improve.

Due to these complaints, the strain they created with Warren's customers, the audit, and other issues, upper-management at Warren took corrective action. Rusty Brown, the Operations Manager, was temporarily reassigned and received a detailed write-up about his poor job performance. The Transportation Manager, Craig Stauffer, also received a disciplinary letter. And Billy Moore, the Blending Manager, was written-up and eventually fired. These individuals were all white.

In late-June 2015, Estok met with Beasley and his supervisor, Gary Whiteside, to discuss Beasley's job performance. The meeting did not go well. According to Beasley, Estok generally discouraged any meaningful discussion. Estok claims that Beasley was unprepared and showed that he did not understand Warren's quality control program. Estok sent Beasley a letter afterward summarizing the meeting and alleging several deficiencies in his performance, including a lack of organizational skills, his failure to document non-conforming products, and his delay in following

-4-

up on requests from management. On August 7, 2015, Warren fired Beasley. The termination notice stated: "[s]ystems have not improved, training is [still] non-existent, documentation has not improved and we are still reviewing complaints for the same items." App. 609. Shortly after, Warren hired Beasley's replacement, who was white.

Beasley subsequently filed an EEOC charge alleging that Warren had treated him differently from other mid-level managers because of his race. The EEOC dismissed Beasley's charge. Beasley then filed this action alleging that Warren's management violated Title VII and 42 U.S.C. § 1981[2] by treating similarly situated white employees more favorably.[3] Warren eventually moved for summary judgment, and the district court granted Warren's motion.

II.

We review a district court's decision to grant summary judgment *de novo*. *Brown v. Diversified Distribution Sys., LLC*, 801 F.3d 901, 907 (8th Cir. 2015). As in other contexts, "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact . . . the movant is entitled to judgment as a matter of law." *Torgerson*, 643 F.3d at 1042-43 (stating that "[t]here is no 'discrimination case exception' to the application of summary judgment").

---

[2] Because "[t]he same analysis [applies] to claims of discrimination . . . under Title VII and 42 U.S.C. § 1981," *Takele v. Mayo Clinic*, 576 F.3d 834, 838 (8th Cir. 2009), we use Title VII as shorthand for both claims below.

[3] Beasley's Complaint also included a cause of action against Warren for retaliation. Because Beasley failed to raise this claim in his opening brief on appeal, the argument is waived. *See United States v. Rice*, 699 F.3d 1043, 1050 (8th Cir. 2012) ("Issues not raised in a party's opening brief are waived.").

Where there is no direct evidence of discrimination, we use the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Torgerson*, 643 F.3d at 1044. First, the plaintiff must make out a prima facie case of discrimination. *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 903 (8th Cir. 2015). If he can do so, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the discharge. *Id.* If this burden is met, the plaintiff must demonstrate that the employer's "proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *Torgerson*, 643 F.3d at 1046. Though the evidentiary burden under this framework alternates between the parties, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

To make a prima facie case for employment discrimination in the context of a discharge, Beasley must establish: (1) he "is a member of a protected group"; (2) he "was qualified for h[is] position"; (3) he "was discharged"; and (4) "the discharge occurred under circumstances permitting an inference of discrimination." *Elam v. Regions Fin. Corp.*, 601 F.3d 873, 879 (8th Cir. 2010). This burden is "not onerous." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 852 (8th Cir. 2005) (cautioning against "conflat[ing] the prima facie case with the ultimate issue of discrimination"), *abrogated on other grounds by Torgerson*, 643 F.3d 1031. Nor are these requirements "intended to be rigid, mechanized, or ritualistic." *Id.* They merely serve the gatekeeping function of "eliminat[ing] the most common nondiscriminatory reasons for [adverse employment actions]." *Burdine*, 450 U.S. at 254.

Beasley makes a prima facie case of discrimination. He plainly meets the first and third requirements: he is a member of a protected group and was fired. Also, there is no dispute that Beasley was qualified for his position. As to the fourth requirement, our cases note that there are multiple ways "a plaintiff can establish an

inference of discrimination . . . ." *Grant v. City of Blytheville*, 841 F.3d 767, 774 (2016). The parties focused their briefing on this point on whether Beasley is able to show that he was treated differently from similarly-situated white employees. Appellant's Br. at 11-12; Appellee's Br. at 6-7. The district court, however, relied on a more straightforward method by which Beasley can satisfy this element—the showing that "he was replaced by a white male." App. 1106; *see Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) (noting that a plaintiff can satisfy the fourth element by showing that "after [his] discharge, he was replaced by a person with similar qualifications"); *see also McDonnell Douglas*, 411 U.S. at 802 (similarly describing the fourth element of the prima facie case in the hiring context). We agree with the district court's analysis on this point, and therefore we find it unnecessary to reach the parties' arguments about disparate treatment in *McDonnell Douglas*'s first stage.

Under the second step of *McDonnell Douglas*, Warren must articulate a "legitimate, nondiscriminatory reason" for the discharge. *Torgerson*, 643 F.3d at 1046. Again, this burden is not heavy. *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012). Warren's explanation must only "raise[] a genuine issue of fact as to whether it discriminated against [Beasley]." *Burdine*, 450 U.S. at 254.

Warren meets this burden. The June 2015 letter Estok sent to Beasley alleged several performance-related deficiencies. Also, Warren received multiple customer complaints during Beasley's tenure and was cited for six deficiencies in the ISO audit. Even if Beasley was disproportionately blamed for these problems, the record is more than sufficient to raise a genuine issue of fact as to whether Warren intentionally discriminated against Beasley.

Under *McDonnell Douglas*'s third step, Beasley must demonstrate that Warren's explanation for his termination is "mere pretext for intentional discrimination." *Torgerson*, 643 F.3d at 1046. A common approach to show pretext

is to introduce evidence that the employer treated similarly-situated employees in a disparate manner. *See Rodgers*, 417 F.3d at 853. However, "the test for whether someone is sufficiently similarly situated, as to be of use for comparison, is rigorous." *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 613 (2014) (en banc). The plaintiff must establish "that he and the employees outside of his protected group were similarly situated in all relevant respects." *Id.* (cleaned up). This means that the plaintiff and the potential comparators must have "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (citation omitted).

Ultimately, we agree with the district court's conclusion that "[t]here simply [we]ren't other employees 'similarly situated [to Beasley] . . . in all relevant respects.'" App. 1107. Beasley provides an initial list of five different individuals at Warren "on the same level of management." Appellant Br. at 10. He later trims the list to three employees "who were [also] involved in conduct that was imputed to the Appellant"—Rusty Brown, Shawn Jamieson, and Ben Heater. *Id.* at 31. Yet Beasley never shows that he and any of these people shared the same supervisor, were subject to the same standards, or engaged in the same conduct. We examine each of these individuals below, but note that our neutral role in the adversarial process makes us wary of combing through the record to supplement a party's arguments. *See Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets . . . to gild a party's arguments.").

Rusty Brown is not similarly situated. Although he was in a similar level of management as Beasley, he had a much longer tenure at Warren—27 years as opposed to 3 years. He also held a number of different positions over the years, which meant that he could be more easily reassigned. Also, although Brown and Beasley both communicated regularly with Estok, they had different direct reports. Finally, Brown's role was never focused on ensuring product quality. He held the

position of Plant Manager, Operations Manager, and Warehouse Manager at different times during relevant events and—under each of these roles—his job was to promote production efficiency. Brown was thus disciplined for production-related issues like the "[f]ailure to meet delivery dates" and the "[f]ailure to properly organize warehouse personnel to optimize loading of outbound shipments." App. 548–49. Brown also played no part whatsoever in helping Warren prepare for the ISO audit.

Ben Heater fails as a comparator for similar reasons. Like Brown, Heater's role as the Laboratory Manager was very different from Beasley's. His specific charge was to test the oil itself to ensure that it met appropriate technical specifications—a stage of the process in which Beasley admits he played no part. Heater's potential responsibility for customer complaints also differs from Beasley's. Even for the complaints relating to the oil (rather than labeling or capping), the record shows that the oil met the required specifications, so the fault lay with the blending department, not Heater. Heater also had a different supervisor than Beasley for some of his time at Warren. Finally, though Heater was hired the same year as Beasley, he had been employed in similar roles for 40 years beforehand.

We have less information about the Maintenance Manager, Shawn Jamieson. His deposition does not appear in the record, and Beasley does not point to where we might determine Jamieson's supervisor, the length of his tenure at Warren, his disciplinary record, and his employment and educational history. We do not have enough to go on to say that he was "similarly situated in all relevant respects."

Even if Jamieson or some other individual at Warren had been similarly situated to Beasley, he would still have to establish that he was treated differently on account of his *race*. This is the central question for a Title VII claim. *See Torgerson*, 643 F.3d at 1046 (noting that, in *McDonnell Douglas*'s third stage, the plaintiff's "burden to show pretext merges with the ultimate burden of persuading the court that [he was] the victim of intentional discrimination") (cleaned up); *Griffith v. City of*

*Des Moines*, 387 F.3d 733, 743 (8th Cir. 2004) ("[T]he key issue under Title VII is whether intentional discrimination occurred.").

Beasley's primary argument is that racial animus can be inferred from Warren's (or perhaps Estok's) practices with respect to African-American employees over time. But Beasley never develops the claim by showing, for example, hiring statistics at Warren, a list of all the employees disciplined during Estok's tenure, salary information for African-American employees, or similar evidence. Nor does Beasley explain the parts of the record that cut the other way. As previously noted, two other mid-level managers, both of whom were white, were disciplined in June 2015, and another white mid-level manager was eventually fired.

Without some way to tie his termination to racial animus, Beasley's claim fails. Though Beasley's termination might have been unfair or disproportionate, this alone is insufficient under Title VII. *See Schaffhauser*, 794 F.3d at 903 ("The question is not whether [the employer] made a good decision, or even a fair one. . . [but] whether it . . . [was] based on discriminatory animus."). Congress has not given "federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers . . . ." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 977 (8th Cir. 2012) (citation omitted). Instead, plaintiffs must provide sufficient evidence of intentional discrimination.

Because we find that Beasley has not established intentional discrimination, either by showing that Warren treated similarly-situated employees in a disparate manner or otherwise, his claims fail.

III.

The judgment of the district court is affirmed.

───────────────────────

-10-