# In the Iowa Supreme Court

No. 23–0628

Submitted April 16, 2025—Filed June 20, 2025

**Darrell Jeffrey McClure,**

Appellant,

vs.

**E. I. du Pont de Nemours and Company** d/b/a **Corteva Agriscience,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Keokuk County, Crystal S. Cronk, judge.

A defendant seeks further review of a court of appeals decision that reinstated the plaintiff's claims for disability and age discrimination. **Decision of Court of Appeals Affirmed in Part and Vacated in Part; District Court Judgment Affirmed.**

May, J., delivered the opinion of the court, in which all justices joined. McDonald, J., filed a concurring opinion.

Megan C. Flynn (argued) of Flynn Law Firm, P.L.C., West Des Moines, and Michael J. Carroll of Carney & Appleby, P.L.C., Des Moines, for appellant.

Daniel J. Gomez (argued), Corteva Agriscience, LLC, Wilmington, Delaware; Susan P. Elgin of Faegre Drinker Biddle & Reath LLP, Des Moines; and Terran C. Chambers of Faegre Drinker Biddle & Reath LLP, Minneapolis, Minnesota, for appellee.

**May, Justice.**

A warehouse employee for an agricultural company claims that he was discriminated against based on his disability and his age in violation of the Iowa Civil Rights Act (ICRA). The district court dismissed those claims at summary judgment. But the court of appeals concluded that fact questions precluded summary judgment. On further review, the company argues that the court of appeals erred and the district court was correct. We agree with the company.

Viewing the record in the light most favorable to the employee, he has failed to present sufficient evidence that he suffers from a qualifying disability. In addition, the employee has failed to show that his employer committed age discrimination. So we vacate in part the decision of the court of appeals and affirm the district court's grant of summary judgment.

## I. Background Facts and Procedural History.

In 1983, Darrell McClure was hired by Corteva Agriscience (then known as Pioneer Hi-Bred International, Inc.). He worked there for the next thirty-six years.

McClure was one of Corteva's product technicians. His job involved using a forklift to move products around Corteva's shipping and processing facility in Hedrick, Iowa.

During most of his employment at Corteva, McClure worked the third shift (an eight-hour shift from 10 p.m. to 6:30 a.m.) or the night shift (a twelve-hour shift from 6 p.m. to 6:15 a.m.). In addition, McClure served as an emergency medical technician at a county hospital. And he served as a city firefighter.

**A. McClure's Medical Condition.** In February 2014, McClure suffered a heart attack. That August, his doctor wrote a note that said McClure "should not be on night shift and [should] remain on day shift." In response, Corteva placed

McClure on day shifts only. For his other jobs, though, McClure still worked night shifts one to two nights a week on an on-call basis.

1. *The doctor's note issue.* Three and a half years later, Corteva's management changed. McClure's new manager, Dan Dehrkoop, told him that he would have to start working nights. McClure responded that he couldn't due to his medical condition. And McClure referred Dehrkoop to his doctor's note from 2014. Initially, Dehrkoop couldn't find the note. But the note was eventually found stuck to some other papers in McClure's file. Dehrkoop then told McClure that he needed to submit a new note that specified McClure's exact work restrictions.

There was some back-and-forth in getting a new note that met Dehrkoop's expectations. Altogether, McClure provided three new doctor's notes. The first said that McClure couldn't work a "prolonged night shift schedule." Dehrkoop responded by asking for "a more pertinent definition of days and nights and what [McClure] can and can't do." The second note, submitted a week later, said that McClure couldn't "work multiple night shifts or a continuous overnight shift schedule consisting of 1900-0600 hours time frame." Still, Dehrkoop wanted a definition of "multiple night shifts." So, a couple of weeks later, McClure submitted a third doctor's note. This note clarified that McClure could, "[i]f needed, . . . work an occasional overnight shift of one shift, but no more than two shifts that are not back to back shifts or a scheduled work schedule as to not severely disrupt his sleep cycle, which would adversely effect his overall medical condition."

2. *McClure's internal complaints.* This exchange over doctor's notes prompted McClure to make an internal complaint with Corteva's ethics hotline in October 2017. McClure wrote that he felt discriminated against based on his

age, years of service, or medical condition. He claimed that Dehrkoop was trying to make it harder for him to obtain a work accommodation.

A few days later, McClure reported a different comment made by Dehrkoop. According to McClure, Dehrkoop questioned why Corteva should adhere to McClure's work restriction when he's a volunteer fire fighter with overnight fires.

In early 2018, Corteva's human resources department (HR) determined that McClure's complaints were unsubstantiated. Around this same time, Corteva approved McClure's request to continue working during the day shift. We also note that from 2014 on, Corteva never required McClure to work two back-to-back second or third shifts.

3. *McClure's second heart attack.* In April 2019, McClure suffered another heart attack. McClure then took short-term disability leave for the next two months.

In June, Dehrkoop emailed Corteva's local HR manager. Dehrkoop reported: "Not sure if there is anything we can do, but I have got several reports . . . that [McClure] who has been out on Short Term Disability (Been out since 4/24), and has to be close to Long term disability has been working as the fire chief" and participating in other activities. The issue was escalated to corporate HR, but nothing came of it.

After McClure returned to work in July, he reported that he was experiencing migraines brought on by his second heart attack. In early 2020, a supervisor questioned McClure about calling in late on various occasions in 2019 and 2020. McClure told the supervisor that he had been late due to his migraines. McClure claims the supervisor responded by saying, "Well, I really doubt that. I think you're just trying to sleep in."

In his 2022 deposition, McClure discussed his medical condition. He explained that his condition did not cause him trouble walking, seeing, hearing, speaking, or learning. As for working, he said his medical condition caused him trouble "occasionally."

**B. McClure's Safety Violations.** Over the course of his employment, McClure racked up a number of safety violations. For our purposes here, we skip over most of them and jump straight to September 2017.

On September 26, McClure received a written "Progressive Discipline Warning." The warning began by saying, "The purpose of this memo is to address serious issues concerning your work performance. These concerns now result in a progressive discipline written warning." The warning then recounted three safety incidents:

- In August 2016, McClure used a forklift to move four stacked boxes across the warehouse.

- In March 2017, McClure used his cellphone on the warehouse floor.

- And in September 2017, McClure used a forklift to move two stacks of boxes that were four-high and side-by-side.

As to the 2017 violations, the warning stated that McClure had "admitted to knowing the correct policy/procedure and deliberat[ely] ignored it." The warning also cautioned that "[i]f further incidents of this nature occur in the future, further disciplinary action will occur, up to and including termination." McClure signed the warning, indicating he "read and under[stood]" it. But now, in this litigation, he claims that his conduct was in line with Corteva's policies or that he had otherwise received manager approval for his conduct.

McClure received a "Below Required Performance" rating that year because of the written warning. Some of McClure's other evaluations were more positive.

For instance, in 2016 and 2019, he received a "Successful Performance" rating. But both of those evaluations informed McClure that he needed to continue to work on his forklift driving. The 2016 evaluation noted behaviors like "cutting the corners at the intersections to speed up time" and failing to "recognize hazards." And the 2019 evaluation said that McClure's driving behavior was not very "fluent." It also said that he failed to follow forklift safety procedures when he wasn't being watched by management.

1. *The forklift sensor data.* In 2019, Corteva began using electronic forklift sensors that could detect and record vehicle movement in real time. The sensors could capture fast acceleration, hard braking, and collisions. The sensors recorded each of these events as an "impact."

McClure's forklift had "a high impact sensor rate for the month of October." And during the first six months of 2020, McClure's forklift recorded twenty-three "impacts." Corteva's data shows that this number of impacts was disproportionately high among the warehouse employees.

2. *The loading dock incident.* On April 6, 2020, McClure was involved in a serious safety incident at the loading dock. McClure had entered a semitrailer to load heavy equipment. The trailer pulled away from the loading dock with McClure and the equipment still inside. This kind of incident doesn't happen in the ordinary course. It doesn't happen because Corteva requires (1) the trailer to be locked to the loading dock and (2) the keys to the truck to be separated from the driver until all equipment has been loaded. Indeed, as Dehrkoop testified, "[McClure is] the only one that I'm aware of that's been in a moving trailer that's been pulling away that I can recall" at the Hedrick site.

McClure blamed the incident on faulty loading dock equipment, but Corteva blamed McClure's loading dock procedure. McClure self-reported the

incident and told the safety supervisor that a younger employee had given the keys to the driver too early. He also said that the dock malfunctioned and falsely signaled that it was locked. But the safety supervisor determined that McClure's account did "not match the evidence." McClure was then issued a "Progressive Discipline Final Written Warning."

This final written warning told McClure: "This behavior is unacceptable and must cease immediately. You put yourself in serious danger." The warning continued: "If further incidents of this nature occur in the future, further disciplinary action will occur, up to and including termination."

A couple of weeks later, McClure received another warning, this time about his increasing problems with "tardiness and unplanned absences." This April 30 warning also said that McClure's behaviors—including his safety violations—"are a serious concern and I want to ensure you understand, with any further performance or attendance violations, your job is in jeopardy."

3. *The June 2020 collision.* Two months later, on June 29, McClure's forklift collided with another operator's forklift. According to McClure, forklift collisions happened less than once a month at the warehouse. Likewise, Dehrkoop testified that forklift collisions were "pretty rare."

Dehrkoop noted that in this instance, both forklifts were traveling at a high speed. But the forklift that was not operated by McClure "took the brunt of the impact." Dehrkoop observed that he did not "know, to this day, if we have seen an impact level higher than that" of McClure's June collision.

Following the collision, Dehrkoop wrote to HR, "I think we are unfortunately ready for termination here. . . . I think we have given him more than enough opportunities." In his deposition, Dehrkoop added that by this

point, McClure had been involved in a "pattern of incidents" despite "multiple" conversations and "multiple written warnings."

4. *A near-miss incident.* Two days after the June 29 collision, McClure was nearly involved in another forklift collision. This "near miss" incident triggered a forklift "lockout," a safety feature that disables the forklift when it detects a high degree of force. McClure claims that another forklift operator had failed to honk his horn before backing out near where McClure was working. McClure said he responded by "slamm[ing] on my brakes to stop before hitting him . . . , and it shut my machine off."

**C. Termination.** About two weeks later, on July 10, Corteva fired McClure. Corteva's termination letter informed McClure that he was being fired due to his "continued failure to meet performance and safety expectations."

**D. Procedural History.** Five months after his termination, McClure filed a complaint with the Iowa Civil Rights Commission alleging age and disability discrimination and retaliation. Later, McClure filed this suit under the ICRA. McClure asserted claims of age discrimination, disability discrimination, retaliation, and hostile-work-environment discrimination.

Corteva filed a motion for summary judgment as to all of McClure's claims. The district court granted Corteva's motion in full. McClure appealed.

The court of appeals affirmed the district court's dismissal of McClure's retaliation and hostile-work-environment claims. But the court reversed as to McClure's age and disability discrimination claims.

Corteva applied for further review. Corteva argues that the court of appeals erred in concluding that McClure's age and disability discrimination claims should survive summary judgment. We granted Corteva's application.

**II. Scope of Review.**

When our court grants further review, we have discretion as to which issues we will consider. *State v. Jackson*, 4 N.W.3d 298, 306 (Iowa 2024). In this case, we confine our analysis to the issues raised by Corteva's application. We let the court of appeals decision stand as to McClure's retaliation and hostile-work-environment claims.

**III. Standard of Review.**

We review summary judgment rulings for correction of legal errors. Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Iowa R. Civ. P. 1.981(3). We view the record in the light most favorable to the nonmoving party. And we draw every reasonable inference in favor of the nonmoving party.

**IV. Analysis.**

**A. Overview.** Iowa Code chapter 216, the ICRA, prohibits employers from engaging in unfair employment practices, including discrimination based on age or disability status. A plaintiff may establish a discrimination claim through either direct or indirect evidence. *Hedlund v. State*, 930 N.W.2d 707, 719 (Iowa 2019). McClure relies on indirect evidence.

When a plaintiff relies on indirect evidence, we employ a three-step burden-shifting analysis at the summary judgment stage. First, the employee must establish a prima facie case of employment discrimination by showing that he is a member of a protected group, he was qualified for his position, and "the circumstances of [his] discharge raised an inference of discrimination." *Feeback v. Swift Pork Co.*, 988 N.W.2d 340, 347 (Iowa 2023). Here, McClure claims he was a member of two protected groups based on his age and medical condition.

If the plaintiff establishes a prima facie case, the burden then shifts to the employer to " 'articulate some legitimate, nondiscriminatory reason' for its employment action." *Id.* at 347–48 (quoting *Hedlund*, 930 N.W.2d at 720); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Here, Corteva claims it fired McClure because of his "demonstrated safety violations and failure to improve performance" despite express warnings.

Finally, the burden shifts back to the employee to show either that (a) the employer's reason wasn't the real reason (i.e., a pretext) or (b) the employer's reason was the real reason, but the employer was also motivated to take an adverse action against the employee because he was part of a protected group. *Feeback*, 988 N.W.2d at 348. Either way, the employee must show that his protected characteristic was a motivating factor in the employer's decision to take an adverse action against him. *Id.* at 347–48; *Hedlund*, 930 N.W.2d at 720.

There is one more rule at play here: the honest belief rule, which we adopted in *Feeback v. Swift Pork Co.*, 988 N.W.2d at 349. As *Feeback* explained, when a court evaluates an employer's proffered reason for terminating an employee, the "critical inquiry . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *Id.* (quoting *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012)). To survive summary judgment, the employee "must show that [his] employer did not honestly believe the legitimate reason that it proffered in support of the" termination. *Id.* at 350 (alteration in original) (quoting *Pulczinski*, 691 F.3d at 1002).

With this framework in mind, we now consider McClure's claims of disability and age discrimination. As will be explained, our disability

discrimination analysis focuses on whether McClure has established a prima facie case. Conversely, our age discrimination analysis focuses on the honest belief rule.

**B. Disability Discrimination.** We start with McClure's claim of disability discrimination. The first question is whether McClure has carried his burden of establishing a prima facie case. A prima facie case requires a showing that (1) "he has a disability," (2) "he is qualified to perform the essential functions" of the job, and (3) "the circumstances of his termination raise an inference of illegal discrimination." *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014).

We focus on the first element, a disability. McClure claims he has a disability for two reasons. First, McClure argues that his work restriction due to his heart attacks qualifies as a disability. Second, McClure argues that Corteva *perceived* him as disabled, and under our law, we treat a perceived disability the same as an actual disability. We address McClure's arguments in order.

1. *"Disability" defined.* For purposes of the ICRA, "disability" is defined as "the physical or mental condition of a person which constitutes a substantial disability." Iowa Code § 216.2(5) (2021). A disability is substantial if it "substantially limits one or more major life activities," such as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Iowa Admin. Code r. 161—8.26(1), (3) (2021); *see also Goodpaster*, 849 N.W.2d at 6 ("Regulations promulgated by the Iowa Civil Rights Commission . . . elaborate on the meaning of a disability."). In making this assessment, courts look to the nature and severity of the impairment, its duration, and its expected permanent or long-term impact. *Bearshield v. John Morrell & Co.*, 570 N.W.2d 915, 919 (Iowa 1997).

McClure asserts that his medical condition resulting from multiple heart attacks is a physical condition that substantially limits the major life activity of working. Consistent with federal law applying the Americans with Disabilities Act (ADA), we have long recognized that "[a] person is substantially limited in his or her ability to work when the person is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.' " *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(i) (1997)). In other words, the inquiry is whether and how "the impairment affects an individual's employability." *Probasco v. Iowa C.R. Comm'n,* 420 N.W.2d 432, 436 (Iowa 1988); *see also Goodpaster,* 849 N.W.2d at 13 n.4 (acknowledging the *Probasco* standard with respect to the major life activity of working). Relevant to this inquiry are "the number and type of jobs from which the impaired individual is disqualified, the geographical area to which the individual has reasonable access, and the individual's job training, experience and expectations." *Probasco,* 420 N.W.2d at 436. In *Probasco v. Iowa Civil Rights Commission,* we said, "An impairment that interferes with an individual's ability to do a particular job but does not significantly decrease that individual's ability to obtain satisfactory employment otherwise is not substantially limiting within our statute." *Id.* The burden is on the plaintiff to show that his impairment substantially limits his ability to work. *See id.* at 436–37; *see also Goodpaster,* 849 N.W.2d at 13.

We take a moment to address McClure's argument that we should not follow caselaw that predates the enactment of the ADA Amendments Act of 2008 (ADAAA) or that relies on the two United States Supreme Court cases that Congress abrogated when it enacted the ADAAA. *See* ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553; *Woolf v. Strada,* 949 F.3d 89, 94

(2nd Cir. 2020) (per curiam) ("The principal purpose of the ADAAA was to overrule the Supreme Court's arguably narrow interpretation of what constitutes an ADA-qualifying disability set forth in *Sutton v. United Air Lines, Inc.*, [527 U.S. 471 (1999),] and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, [534 U.S. 184 (2002),] and to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one."). To be sure, Congress did "instruct[] courts that the 'definition of disability . . . shall be construed in favor of broad coverage of individuals,' and that an impairment that 'substantially limits one major life activity need not limit other major life activities in order to be considered a disability.'" *Woolf*, 949 F.3d at 94 (omission in original) (first quoting 42 U.S.C. § 12102(4)(A); and then quoting *id.* § 12102(4)(C)).

But here, working is the only major life activity McClure identifies as being limited by his medical condition. So cases like *Goodpaster v. Schwan's Home Service, Inc.*, where the employee raised fact issues about whether his multiple sclerosis substantially limited his ability to perform major life activities in addition to working, such as walking or seeing, do not assist McClure. *See* 849 N.W.2d at 13 & n.4 (noting that "the ability to work is something of a disability discrimination catchall, and 'impairments that substantially limit a person's ability to work usually substantially limit one or more other major life activities'" (quoting 29 C.F.R. § 1630.2(j) app. (2013))). And federal courts have made clear that nothing in the ADAAA "suggests that Congress intended to modify, let alone abandon altogether, the well-established understanding that an employee's 'inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Woolf*, 949 F.3d at 94 (quoting *Cameron v. Cmty. Aid for Retarded Child., Inc.*, 335 F.3d 60, 65

(2d Cir. 2003)). Indeed, "every Circuit that has addressed this question in the aftermath of the ADAAA also has held that Congress's amendments did not change the fact that 'a plaintiff alleging a work-related disability must show that his condition precludes him from working in a *class or broad range of jobs.*' " *Id.* at 95 & n.36 (quoting *Booth v. Nissan N. Am., Inc.*, 927 F.3d 387, 394 (6th Cir. 2019)) (collecting cases and joining sister circuits). Thus, even setting aside the fact that Congress's 2008 amendments to the ADA had no bearing on the unaltered Iowa Code section 216.6, these principles addressing work as a major life activity continue to guide the question of whether an individual's impairment substantially limits their ability to work.

2. *Whether McClure's medical condition constitutes a "disability" under the ICRA.* So the question here is whether McClure met his burden by coming forward with evidence that his medical condition substantially limited his ability to work. If so, he has generated a jury question as to whether his medical condition constitutes a "disability" under the ICRA.

We conclude that McClure has failed to make this showing. Both in his summary judgment resistance and in his appellate briefing, McClure makes conclusory assertions about his alleged disability. But conclusory assertions are insufficient. Rather, McClure must point to record evidence showing that his medical condition was either "generally debilitating" or significantly decreased his ability to obtain satisfactory employment in a wide range of jobs beyond one particular job. *Goodpaster*, 849 N.W.2d at 13 n.4; *see also Henkel Corp. v. Iowa C.R. Comm'n*, 471 N.W.2d 806, 810 (Iowa 1991) (per curiam) (rejecting "the implication from *Probasco* that one must be almost unemployable because of one's impairment to be considered disabled" and finding substantial evidence to support the Iowa Civil Rights Commission's finding that the employee was

disabled where his "mental condition was generally debilitating and would affect him regardless of the job he might hold"); *Probasco*, 420 N.W.2d at 436 ("An impairment that interferes with an individual's ability to do a particular job but does not significantly decrease that individual's ability to obtain satisfactory employment otherwise is not substantially limiting within our statute.").

McClure has not done so. McClure asserts only that his medical condition limits his ability to work back-to-back overnight shifts. But McClure has not shown that this limitation "would affect him regardless of the job he might hold." *Henkel Corp.*, 471 N.W.2d at 810. McClure made no evidentiary showing as to his employability in other positions inside or outside of Corteva. *Cf. Bearshield*, 570 N.W.2d at 920–22. So we conclude that the dayshift-only limitation is a "rather narrow limitation [that] did not significantly curtail [McClure's] ability to obtain other employment" without that limitation. *Vincent v. Four M Paper Corp.*, 589 N.W.2d 55, 62 (Iowa 1999) ("Vincent was prohibited by his physician from working on or around heavy equipment and dangerous machinery. While this did preclude Vincent from working at his former position of machine tender, this rather narrow limitation did not significantly curtail Vincent's ability to obtain other employment not involving heavy equipment or dangerous machinery."); *see also Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 640–41, 644–45, 647 (2d Cir. 1998) (holding that the plaintiff failed to meet his burden where he had only submitted doctor's notes that recommended he be limited to the day shift because of his cerebral hemorrhage), *superseded in part by statute*, 42 U.S.C. § 12102(3)(A) (related to being "regarded as having such an impairment"); *Runkle v. Potter*, 271 F. Supp. 2d 951, 953–54, 962 (E.D. Mich. 2003) (holding that the plaintiff failed to meet his burden where the "[p]laintiff ha[d] only shown, at best, an inability to work" the night shift due to his seizure disorder); *Serow v.*

*Redco Foods, Inc.*, 187 F. Supp. 2d 47, 51 (N.D.N.Y. 2002) (concluding that the plaintiff's cardiovascular disease did not qualify as a disability where it "only affect[ed], if at all, [the plaintiff's] ability to work on a certain schedule"); *Eibest v. Planned Parenthood of Stark Cnty.*, 94 F. Supp. 2d 873, 876–77 (N.D. Ohio 2000) (holding that the plaintiff failed to meet her burden where she alleged that her Epstein-Barr virus rendered her unable to work evenings as a nurse and thus restricted her employment opportunities but offered only "speculation that most other nursing positions [would] entail similar shift requirements"). So McClure has failed to meet his burden of showing that his condition amounts to a disability.

3. *Perceived disability.* McClure also argues that—regardless of whether his condition qualifies as a disability—Corteva *perceived* him as disabled and then took an adverse action against him based upon that perceived disability. *See* Iowa Admin. Code r. 161—8.26(1) (defining "substantially" disabled as including being "regarded as having such an impairment"). On this point, McClure claims "Dehrkoop perceived [him] and others as disabled" and imposed unfair discipline, questioned accommodations, required multiple rounds of accommodation letters, reviewed and scrutinized attendance, and treated nondisabled employees better.

We discussed perceived disability claims in *Vincent v. Four M Paper Corp.*: "In considering the perceived disability doctrine, we have restricted its use to those cases in which the adverse employment decision 'rested on myths, fears, or stereotypes,' the type of conduct which the ICRA was intended to remedy." *Vincent,* 589 N.W.2d at 62 (quoting *Howell v. Merritt Co.*, 585 N.W.2d 278, 281 (Iowa 1998) (per curiam)). We said that "[t]he plaintiff must establish that the defendant failed to make the employment decision based on an individualized

assessment of the plaintiff's condition, and instead based its decision on myths, fears or stereotypes." *Id.* at 63. We've applied this distinction in other cases as well. *Compare Bearshield*, 570 N.W.2d at 923 (perception), and *Howell*, 585 N.W.2d at 281 (same), *with Vincent*, 589 N.W.2d at 63 (individualized assessment), and *Smith v. Creston Mun. Utils./Water Dep't.*, No. 10–0181, 2010 WL 4792159, *4–5 (Iowa Ct. App. Nov. 24, 2010) (same).

The district court concluded that McClure failed to show a perceived disability because McClure offered no evidence of the "attitude of others" and because—according to McClure's testimony—a supervisor stated that he did not believe McClure was actually experiencing migraines. We think the district court was correct. McClure provided no evidence that Corteva rested his firing on myths, fears, or stereotypes about his medical condition. So he cannot show a perceived disability.

4. *Conclusion.* Because McClure failed to show evidence of a disability—actual or perceived—McClure failed to establish a prima facie case of disability discrimination. The district court was correct to dismiss McClure's disability discrimination claim.

**C. Age Discrimination.** We now turn to McClure's age discrimination claim. Like the court of appeals, we assume McClure has established a prima facie case of age discrimination. Likewise, we assume Corteva has offered a legitimate, nondiscriminatory reason for firing McClure, namely, his safety record. The real question is whether McClure's evidence would allow "a reasonable jury [to] conclude" that "the real reason" he was fired was his age, not his safety violations. *Hedlund*, 930 N.W.2d at 720 (quoting *Smidt v. Porter*, 695 N.W.2d 9, 15 (Iowa 2005)).

Although Corteva claims it honestly believed that McClure was a safety risk, McClure tries to challenge that belief by disputing whether he actually committed safety violations. McClure also compares himself to two employees who received lesser discipline than he did ("comparator evidence"). And McClure offers evidence that other older employees also suffered unwarranted discipline ("discriminatory atmosphere evidence"). We start with Corteva's honest belief.

1. *Corteva's honest belief.* As explained, Corteva claims that McClure was fired because he was involved in several significant safety violations. But the court of appeals determined that McClure provided enough evidence to show that this professed reason was pretextual. As support, the court of appeals noted that McClure disputed many of the safety violations, managers knew about the unreliability of the loading dock and the forklift sensors, and McClure had received some positive performance reviews just before he was fired.

We reach a different conclusion. The governing precedent is *Feeback*, 988 N.W.2d 340. In *Feeback*, an employee was fired for insubordination after he texted an obscenity to his employer. *Id.* at 343. The employee claimed that he sent the obscene message to his employer by mistake. *Id.* The court of appeals determined that because "other evidence arguably support[ed]" this mistake theory, Feeback had raised a jury question on pretext. *Id.* at 349. We disagreed. "The question," we said, was "not whether Feeback sent the texts accidentally." *Id.* Rather, the question was "whether [the employer] had a good-faith honest belief that Feeback was insubordinate." *Id.* Under the record presented, we concluded that Feeback had failed to challenge his employer's belief that he was insubordinate. *Id.* at 349–50.

Like Feeback, McClure has failed to challenge Corteva's belief that he was a safety risk. *See id.* It's undisputed that, within a period of two months, McClure

was involved in three substantial safety incidents: (1) the loading dock mishap, (2) the forklift collision, and (3) the forklift lockout. In addition, McClure's forklift sensor recorded a disproportionate number of impacts compared to the rest of the warehouse employees. And so, just as Feeback's employer believed he was insubordinate because of his text message, Corteva believed McClure was a safety risk because he was involved in these safety incidents. And just as Feeback's misdirected-text evidence did nothing to change the fact that his employer believed his text was insubordinate, McClure's various disputes about his safety violations, positive performance, and the like, cannot change the fact that Corteva believed McClure was a safety risk based on events that indisputably happened. None of McClure's evidence shows that Corteva "did not honestly believe the legitimate reason that it proffered in support" of its decision to fire McClure. *Id.* at 350 (quoting *Pulczinski,* 691 F.3d at 1002); *see also Pulczinski,* 691 F.3d at 1004 ("This is not a case where '[t]he record in support of the employer's conclusion is . . . so sparse, or the employer's conclusion so implausible, that [Pulczinski's] challenge to the *merits* of the decision can create a genuine issue about whether the employer's *motivation* was impermissible.'" (alterations and omission in original) (quoting *McCullough v. Univ. of Ark. Med. Scis.,* 559 F.3d 855, 862 (8th Cir. 2009))). And so, following *Feeback,* McClure has failed to raise a jury question as to whether his safety violations were a pretext for age discrimination.

2. *Comparator evidence.* McClure also tries to show pretext in a different way. He argues that *his* firing based on safety violations was pretextual because *two younger employees* were involved in two of the same safety violations—and yet they were not fired. The court of appeals concluded this was adequate comparator evidence. We disagree.

One way of demonstrating pretext is by "introduc[ing] evidence that the employer treated similarly-situated employees in a disparate manner." *Feeback*, 988 N.W.2d at 350 (quoting *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 938 (8th Cir. 2019)). But the plaintiff must prove that the comparator employees were "similarly situated in all relevant respects." *Id.* (quoting *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013)). As part of this proof, the plaintiff must identify a comparator employee "who committed an offense of comparable seriousness" but did not suffer the same adverse employment action. *Id.* We have said that this test is rigorous. *Id.*

We conclude that McClure has failed to show that his two proposed comparators are similarly situated in all relevant respects. It's true that one of them was involved in the loading dock incident and that the other was involved in the forklift collision. And it's also true that these two employees were not fired, as McClure was. But there's no evidence that the comparators had records of frequent, serious safety violations like McClure's. There's also no evidence that the comparators had disciplinary histories like McClure's. Nor does it matter that McClure disputes the extent and accuracy of his safety record and discipline. It doesn't matter because although McClure was undisputably involved in multiple serious safety incidents, the other two employees were not involved in anything similar—so far as we can tell. Indeed, the record is silent as to the other two employees' safety records. So McClure's comparator evidence cannot support an inference that Corteva's reason for firing him—his safety performance—was pretextual.

3. *Discriminatory atmosphere evidence.* Finally, McClure points to the declarations and deposition testimony of some older Corteva employees who claim they experienced age discrimination. The court of appeals concluded that

this was "competent evidence" of Corteva's discriminatory atmosphere. We disagree.

Evidence of a discriminatory atmosphere can be relevant if it shows the "employer's state of mind," which may help "determin[e] what motivated the acts in question." *Hamer v. Iowa C.R. Comm'n,* 472 N.W.2d 259, 263 (Iowa 1991). Whether the evidence actually *is* relevant "depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn,* 552 U.S. 379, 388 (2008); *see also Salami v. Von Maur, Inc.,* No. 12–0639, 2013 WL 3864537, at *8–9 (Iowa Ct. App. July 24, 2013). The relevancy analysis also includes factors such as "whether such past discriminatory behavior by the employer is close in time to the events at issue in the case, whether the same decisionmakers were involved, whether the witness and the plaintiff were treated in a similar manner, and whether the witness and the plaintiff were otherwise similarly situated." *Valdez v. W. Des Moines Cmty. Schs.,* 992 N.W.2d 613, 640 (Iowa 2023) (quoting *Elion v. Jackson,* 544 F. Supp. 2d 1, 8 (D.D.C. 2008)).

In this case, McClure theorizes that Corteva's management discriminated against older employees by subjecting them to unwarranted monitoring and discipline that would eventually force them to quit or, in McClure's case, lead to their termination. As support for this theory, McClure testified that a previous plant manager said he was going to "get rid of all Ron's people." This was a reference to Ron Donohue, who was apparently "one of the original construction people" for the plant.

In addition to his own testimony, McClure points to this evidence:

- A sixty-three-year-old current employee testified that management "constantly watch[ed him]" and wrote him up twice for things he didn't

do or for things that management had asked him to do. He also testified that he believed McClure was fired because McClure "was a Ron Donohue employee, and they were trying to get us -- all the older ones out."

- A sixty-one-year-old former employee testified that Dehrkoop wrote him up for things he didn't do while driving his forklift. He also said that "[o]lder employees were not being treated well and were treated worse than younger employees at the plant."

- A sixty-six-year-old former employee described the work environment as "tension in the air" and "not healthy." He described a situation where a manager accused him of driving a forklift faster than it was physically able to drive. He added: "I believe that some of the tension is created by unjustified discipline which has been given to employees by management/supervisors."

We conclude that this testimony by McClure and the other three employees is not sufficient to raise a jury question. To begin with, much of the testimony is unsupported speculation on topics such as the reason McClure was fired and whether other employees were disciplined without justification. *See Feeback*, 988 N.W.2d at 352. As to the alleged Donohue statement, McClure does not allege that anyone who was involved in *McClure's* discipline made that statement. It's not even clear when the statement was made. In short, none of the testimony provides any competent direct evidence that age was a motivating factor for McClure's (or any other employee's) discipline. *See id.*

All we are left with, then, is a comparison between McClure's circumstances and those of some other employees. But the comparison is not a close one. To be sure, some of the acts alleged by those employees involved the

same managers, including Dehrkoop, and occurred during the same timeframe as McClure's troubles. Also, like McClure, some of the older employees received write-ups that were allegedly unwarranted.

But these similarities are overwhelmed by differences. For one thing, unlike McClure, none of the other employees were fired. In fact, one of them is still employed by Corteva. And nothing in the record suggests that the other employees' write-ups involved violations of the same seriousness as McClure's or imposed similar consequences.

Beyond that, McClure offers no evidence that Corteva *disproportionately* disciplined its older employees. *See id.* If anything, the evidence seems to cut in the opposite direction. For instance, a twenty-eight-year-old current employee testified that she also received an unwarranted write-up for her forklift driving.

All things considered, McClure has failed to show that Corteva took adverse actions against its employees based on their age.

**V. Disposition.**

The district court correctly granted summary judgment to Corteva as to all of McClure's claims.

**Decision of Court of Appeals Affirmed in Part and Vacated in Part; District Court Judgment Affirmed.**

McDonald, J., files a concurring opinion.

**McDonald, Justice (concurring).**

I join the court's well-reasoned opinion in full, but I write separately to address the *McDonnell Douglas* burden-shifting test as applied at summary judgment. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The test has been soundly and widely criticized by others, *see Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. ___, ___, 2025 WL 1583264, at \*9–12 (June 5, 2025) (Thomas, J., with whom Gorsuch, J., joins, concurring); *Hittle v. City of Stockton*, 145 S. Ct. 759, 759–64 (2025) (Thomas, J., with whom Gorsuch, J., joins, dissenting from the denial of certiorari and discussing the issue); *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 949–58 (11th Cir. 2023) (Newsom, J., concurring), and I need not repeat those criticisms herein. I would merely note that for the purposes of Iowa law, the *McDonnell Douglas* burden-shifting framework is inconsistent with the Iowa Rules of Civil Procedure. Iowa Rule of Civil Procedure 1.981(3) provides that summary judgment shall be granted only if the summary judgment record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The rule has no special exception or test for employment discrimination cases. The ultimate issue in an employment discrimination case is the existence of "discrimination *vel non*." *Smidt v. Porter*, 695 N.W.2d 9, 15 (Iowa 2005) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000)). I am confident that our courts are adequately equipped to resolve the common-sense question of whether there is a genuine issue of material fact on the existence of discrimination vel non without using the *McDonnell Douglas* burden-shifting framework. In the appropriate case, we should reconsider whether *McDonnell Douglas* is the appropriate test for resolving motions for summary judgment in employment discrimination cases.